UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZAM & ZAM SUPER MARKET, LLC, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> IGNITE PAYMENTS, LLC; FIRST DATA MERCHANT SERVICES CORPORATION; and FIRST DATA CORPORATION, <br><br> Defendants. | Civil Action No. _16-cv-6370_____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Zam & Zam Super Market, LLC ("Plaintiff" or "Zam Market"), by and through its undersigned counsel, on behalf of itself and the proposed Class defined herein, files this Class Action Complaint and alleges the following based on personal knowledge, investigation of counsel, and information and belief.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, injunctive relief, and declaratory relief against Defendants Ignite Payments, LLC ("Ignite"), First Data Merchant Services Corporation ("FDMS"), and First Data Corporation ("FDC") (collectively, "Defendants").

2.      In today's business world, most merchants must accept payment for goods and services via credit and debit cards.  To be able to accept these payment methods, merchants are required to engage a card processing company to provide and manage the various card-processing-related services.

3.      Defendants provide card processing services to small and medium-sized businesses like Plaintiff, in exchange for fees paid by the merchants. Defendants' customers rely on Defendants to treat them fairly.  The fees paid for card processing services are one of the largest expenses most merchants incur— typically the third largest expense, after labor and product costs.

4.      Defendants have systematically exploited their position of trust and power by unfairly and deceptively "cramming" Plaintiff and their other merchant customers with "optional" services that the merchants specifically declined and that provide no benefit to the merchants.  Defendants' misconduct alleged herein violates the express terms of their form contracts with Plaintiff and the Class, and violates the implied covenant of good faith and fair dealing.

5.      As a direct result of Defendants' misconduct alleged herein, Plaintiff and the other members of the proposed Class have been damaged by incurring improper charges, and Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

## JURISDICTION AND VENUE

6.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 members of the proposed Class, the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different than at least one of the Defendants.

7.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within the State of New York, such that Defendants have significant, continuous, and pervasive contacts with this State.

8.      Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendants conduct business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district. Moreover, Defendants' form contracts with Plaintiff and the Class specifies this Court as the proper forum.

## THE PARTIES

9.      Plaintiff Zam Market is a small, independently-owned food market located in Dearborn, Michigan.  Zam Market has been in business since August 2013, and is a former customer of Defendants.

10.     Defendant Ignite is a California limited liability company.  Ignite is a "merchant acquirer" (explained further below) that was founded in 1988 as

"Cardservice International."  The company changed its name to Ignite Payments in 2013.  As a limited liability company, Ignite is considered an "unincorporated association" for purposes of jurisdiction under the Class Action Fairness Act.  28 U.S.C. § 1332(d)(10).  Since its inception, Ignite has partnered with FDMC and FDC to provide processing services for the merchants it acquired.  FDC took a majority-ownership stake in Ignite in 1997 and assumed 100 percent ownership of Ignite in 2001.  Since that time, Ignite has been a wholly-owned subsidiary of FDC.

11.     Defendant FDMS is a Florida corporation with its principal offices located in Atlanta, Georgia.  FDMS is one of the largest payment processing companies in the world, with annual revenues exceeding $10 billion.  FDMS is a wholly-owned subsidiary of Defendant FDC.

12.     Defendant FDC is a Delaware corporation with its principal offices located in Atlanta, Georgia.

<u>**FACTUAL ALLEGATIONS**</u>

**The Card Processing System**

13.     The card processing system is complex and involves many parties.  In addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).   <u>The Card Issuer</u> –   the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one of its cards for a transaction.   These companies charge fees that are usually calculated as a percentage of a transaction price plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  These fees are generally known as "interchange rates."  These fees vary based on the type of card used.  For example, card issuers may charge a higher fee for transactions involving a "rewards" credit card than a card with no rewards program.

(b).   <u>The Card Network</u> – the card networks (*i.e.*, Visa, MasterCard, Discover, American Express) also charge per transaction fees.  By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee.  The card networks also charge various additional fees depending on the type of transaction.  These fees are generally known as "assessments."

(c).   <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited and the merchant's account is credited.  Defendant FDMC is a payment processor, and in fact is one of the largest payment processors in the

world.

(d).   The Member Bank – only banks, such as Wells Fargo Bank, N.A., may be members of card networks.   These member banks "sponsor" payment processors so they may process transactions through the card networks.

(e).   The Merchant Acquirer – this is the company that markets the payment processor's services to merchants, or aggregates the merchant accounts opened by Independent Sales Organizations ("ISOs").   ISOs are also known as Member Service Providers ("MSPs").   Merchant acquirers essentially act as a "middle man" between merchants and payment processors.   They enroll merchants in payment processing services, provide customer support to the merchant, and handle monthly billing and collections.   Defendant Ignite is a merchant acquirer and ISO/MSP.   For example, it refers to itself as "a registered ISO/MSP of Wells Fargo Bank, N.A."

14.   Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment contracts with an ISO/MSP to obtain such services.   This contract sets forth the fees that the merchant will be charged, which commonly consist of two parts:

(a).   "Pass Through" Costs – these charges consist of the "interchange rates" imposed by card issuers and the "assessments" imposed by card networks.   These costs are set in amount and are "passed through" to the

merchant on their monthly billing statement.

(b).   <u>Payment Processing Fees</u> – these are the fees that the merchant is charged by the payment processor and/or merchant acquirer for payment processing services.  Unlike interchange rates and assessments, these fees are not set by third parties.  They are governed by the contracts between merchants, on the one hand, and the payment processor and/or merchant acquirer, on the other hand. These fees, too, are reflected on the merchant's monthly billing statement.

**Merchants Rely on Companies Like Defendants.**

15.   Given the complex nature of, and the numerous entities involved in, the card processing system, merchants—especially small businesses like Zam Market—must rely on companies like Defendants to provide and manage card processing for them.

16.   Plaintiff Zam Market and the other merchants in the proposed Class each engaged Defendants to provide and manage card processing services for them.

**Defendants' Merchant Agreement and Program Guide**

17.   To engage Defendants' services, Plaintiff and the other Class members were required to complete and sign a Merchant Processing Application and Agreement (the "Merchant Agreement").  The Merchant Agreement is a standard form contract of adhesion, drafted by Defendants, that sets forth the

services that will be provided to the merchant and the exact fees that Defendants will charge the merchant.

18.   The Merchant Agreement includes, in Section 8, a fee schedule for certain standard services that are mandatory (not optional).  The mandatory fees set forth in Section 8 include the "pass through" third-party charges discussed above, as well as the various payment processing fees that will be charged by Defendants, such as authorization fees, access fees, batch fees, chargeback fees, non-receipt of PCI validation fees, compliance services fees, and monthly customer service and account fees.

19.   The Merchant Agreement also includes—in a separate Section 9 entitled "Optional Services Fee Schedule"— certain "optional" services that the merchant can elect or decline, along with the fees that would be charged by Defendants for such services should the merchant elect to receive those particular services.

20.   For example, one of the "optional" services offered in Section 9 of the Merchant Agreement is TransArmor Solution (hereinafter, "TransArmor"), a service that is provided by FDMC and that Defendants describe as:

> a dual-layered payment card security solution that combines software-
> or hardware-based encryption with tokenization technology.
> TransArmor secures the transaction from the moment of swipe – prior
> to transmission and throughout the payment process - with encryption
> and prevents card data from entering the merchant's card data

environment (CDE) by replacing the primary account number (PAN) with a random-number token.

21.     Another "optional" item offered in Section 9 of the Merchant Agreement is the "Platinum Services Monthly Package," which is a "bundle" that includes TransArmor and other additional services such as "Offer Wise Solution," "SpendTrend analytics," and "Equipment Replacement Program."

22.     The Merchant Agreement incorporates by reference a document called the "Program Guide"—which is another form contract of adhesion drafted by Defendants and offered to merchants on a take-it-or-leave-it basis, is more than 50 pages in length, and sets forth various terms and conditions that apply to Defendants' provision of services to merchants.

23.     Among other things, the Program Guide reiterates that TransArmor is an optional service, specifying that certain TransArmor-specific terms and conditions apply "if [the merchant] elect[s]" the TransArmor service.

24.     To engage Defendants' services, merchants must indicate their agreement with the Merchant Agreement, including the incorporated Program Guide, by signing at the end of the Merchant Agreement.  A copy of the Merchant Agreement that Plaintiff Zam Market signed is attached hereto as Exhibit A.  A copy of Defendants' Program Guide is attached hereto as Exhibit B.

**Defendants Systematically Crammed Plaintiff and Other Merchants with "Optional" Services the Merchants Declined.**

25.     The complexity of the card processing process makes it difficult for merchants to understand whether card processing companies like Defendants are charging them only the fees that are allowed by their contracts.

26.     Defendants have systematically taken advantage of this confusion, luring in merchants like Plaintiff Zam Market with the promise of straightforward, transparent pricing, and then exploiting their position of power and control to sneak in improper and unauthorized charges, including charges for "optional" services that the merchants specifically declined and that provide them no benefit.

27.     For example, Defendants unilaterally crammed Plaintiff Zam Market and other merchants with the TransArmor service, charging them approximately $20 per month for the service, even though the merchants specifically declined TransArmor in their Merchant Agreements.

28.     To make matters worse, Defendants snuck these unauthorized TransArmor charges into the merchants' statements in a highly deceptive manner that was deliberately designed by Defendants so that the charges would go unnoticed for months or longer.

29.     Plaintiff Zam Market and other merchants that Defendants crammed with TransArmor could not have received any benefit from this unwanted service. To actually use and receive any benefit from TransArmor, a merchant needs to: (a)

"register" for TransArmor (registration is distinct from electing in the Merchant Agreement to receive the service, and happens after the merchant is signed up for the service); and (b) have access to an encryption key that Defendants provide to TransArmor registrants.   On information and belief (and based on personal knowledge as to Plaintiff) the vast majority of merchants that Defendants crammed with TransArmor have not registered for TransArmor and/or have not received the encryption key.

30.   Defendants' improper and unauthorized charges alleged herein were imposed by Defendants in a deceptive manner, and designed by Defendants so that the charges would go unnoticed by merchants for months or longer.  Among other things, Defendants lulled unsuspecting merchants into a false sense of comfort by timing the cramming of unwanted services so that they occur several months after the merchants begin conducting business with Defendants, and thus after the merchants have already received and reviewed multiple monthly statements (without unwanted services) from Defendants.   Moreover, when the crammed services and improper charges are imposed by Defendants, Defendants provide inadequate and deceptive disclosure, which even if noticed by the merchant, falsely suggest that the services were requested by the merchant, are non-optional, and/or are being provided free of charge.

31.    Defendants' misconduct alleged herein has been systemic and a matter of corporate practice.

32.    For those merchants that eventually figure out they have been subject to these improper charges by Defendants, and raise the issue with Defendants, Defendants unfairly use the Merchant Agreement's early termination clause— which requires the merchant to pay hefty fees to get out of the relationship (*see, e.g.,* Exhibit A, Confirmation Page, § 8)—as a hammer to dissuade these cheated customers from terminating their relationship with Defendants.

**Plaintiff Zam Market**

33.    Shortly after Plaintiff Zam Market opened for business in August of 2013, it was approached by an agent for Ignite.  At that time, Plaintiff did not accept credit or debit card payments.  The Ignite agent informed Plaintiff that Ignite, and its processing company-partner FDMC, could process debit and credit card payments for Plaintiff at a low cost.  The Ignite agent presented the form Merchant Agreement to Plaintiff.

34.    Plaintiff engaged Defendants' services by filling out and signing a Merchant Agreement in August 2013.

35.    Plaintiff did not desire to receive any of the "optional services" listed in Section 9 of the Merchant Agreement (including TransArmor), which Plaintiff deemed unnecessary and excessive.  Plaintiff's intent not to receive these services

is manifested in Plaintiff's Merchant Agreement itself.    In the Merchant Agreement that it signed, Plaintiff declined the "optional" TransArmor service, and likewise declined the "optional" Platinum Services Monthly Package. *See* Exhibit A hereto.

36.    After entering into the Merchant Agreement, and starting to conduct business with Defendants, Plaintiff began receiving monthly statements from Defendants.  For several months, Plaintiff closely reviewed in detail the statements each month.  Although the statements were formatted in a manner that made it difficult for Plaintiff to determine if the charges being assessed by Defendants were proper, the charges appeared to Plaintiff to be legitimate.

37.    On October 31, 2014, a little more than a year after Plaintiff first engaged Defendants' services, and unbeknownst to Plaintiff, Defendants began assessing a $19.95 monthly fee on Plaintiff for the TransArmor service, debiting such fee directly from Plaintiff's bank account each month.  Thus, Defendants began unilaterally cramming a hefty monthly fee for an "optional" service that Plaintiff not only never requested, but that Plaintiff had in fact *specifically declined* in the Merchant Agreement.

38.    Defendants imposed the improper and unauthorized $19.95 monthly TransArmor charge on Plaintiff for more than 20 months without Plaintiff's knowledge or consent.  It was only when Plaintiff obtained the assistance of a

payment processing expert that it was alerted to these improper and unauthorized charges.  After learning of these charges, Plaintiff promptly terminated its relationship with Defendants.

39.  Not only had Plaintiff specifically declined the TransArmor service, Plaintiff never received any information explaining how Plaintiff could use or benefit from TransArmor.  In fact, Plaintiff never received any benefit from the TransArmor service despite being charged for the service for numerous months. Plaintiff never "registered" for TransArmor, nor did it ever receive any encryption key for TransArmor, both of which would have been necessary in order for Plaintiff to even have any possibility of receiving any benefit from the service.

40.  A review of Plaintiff's historical statements reveals that in the September 2014 statement, Defendants buried the following language in the statement (in much smaller font that shown here):

> Great News! Your business now has the expanded security of the TransArmor Solution that helps protect you from the significant costs of a data breach and helps you stay ahead of continually changing industry requirements. You should have received a package in the mail with all the details.  Call us at 866-359-0978 or go to ignitepayments.com/transarmor to register.

41.  This language was included in the middle of several other dense paragraphs and was formatted in such a manner so that it drew as little attention as possible.

42.    Even if Plaintiff had seen this buried statement language (or received the package in the mail that the statement's language *incorrectly* asserts had been sent by Defendants to Plaintiff), given that Plaintiff had expressly declined TransArmor in the Merchant Agreement and had never "registered" for the service, a reasonable reading of the language would have been that TransArmor was being made available to Plaintiff free of charge (or least that there would be no charge absent Plaintiff's affirmative consent to receive the service and registration for the service).

## CLASS ALLEGATIONS

43.    Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of the following "Class":

> All customers of Defendants in the United States that were assessed a fee for TransArmor, or another optional service, that had previously been declined.

44.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

45.    Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which any Defendants have a controlling interest, all customers who make a timely election to be excluded, and

all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

46.     The members of the Class are so numerous that joinder is impractical. The Class consists of at least thousands of members, the identity of which is within the knowledge of Defendants and can be ascertained from Defendants' records.

47.     The factual basis of Defendants' misconduct is common to members of the Class, and represents a common thread of conduct resulting in injury to all members of the Class.  There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.  Among the questions of law and fact common to the Class are:

(a).    Whether Defendants charged Plaintiff and the Class for optional services that they declined;

(b).    Whether Defendants charged Plaintiff and the Class fees that were not authorized by their contracts;

(c).    Whether Defendants abused their contractual discretion and/or power in cramming services and corresponding charges on Plaintiff and the Class;

(d).    Whether Defendants acted in bad faith;

(e).    Whether Defendants' contracts with Plaintiff and the Class included unconscionable or otherwise unenforceable provisions;

(f).    The proper method(s) by which to measure damages and/or restitution for Plaintiff and the Class; and

(g)    Whether Plaintiff and the Class are entitled to injunctive and/or declaratory relief.

48.    Plaintiff's claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unconscionable provisions of the Merchant Agreement.    Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Class.

49.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

50.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, most Class members could not afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

51.   Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

52.   The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants.

53.   Defendants refuse to correct their conduct and such inaction is generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.  Defendants continue to engage in the improper billing conduct alleged herein and continue to enforce unconscionable or otherwise unenforceable contractual provisions in order to block Plaintiff and the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

## FIRST CLAIM FOR RELIEF

### Breach of Contract and Breach of the Covenant
### of Good Faith and Fair Dealing

54.     Plaintiff repeats paragraphs 1 through 53 above.

55.     Plaintiff and the Class entered into contracts with Defendants.

56.     By their conduct alleged herein, Defendants have breached their contracts with Plaintiff and the Class, including by imposing charges that were unauthorized, including but not limited to TransArmor fees and fees for other optional services that Plaintiff and the Class members declined.  Such conduct violated the contracts' provisions setting forth the services that would be provided and the fees that would be charged, and also specifically violated Section 9 of the Merchant Agreement, which expressly defined TransArmor and other services as being "optional."

57.     Additionally, New York law imposes upon each party to a contract the duty of good faith and fair dealing.[1]  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the spirit and substance of their contracts in addition to its form.  Evading the spirit of

---

[1] The Program Guide, incorporated by reference in the Merchant Agreement, provides that New York law applies.

the bargain and abusing discretion and/or the power to specify terms constitute examples of violations of good faith in the performance of contracts.  Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

58.     Defendants have breached the covenant of good faith and fair dealing through their conduct alleged herein, including by abusing their discretion and power under their contracts with Plaintiffs and the Class and by performing under such contracts in a bad faith and deceptive manner.  To the extent Defendants' contracts with Plaintiff and the Class purport to give Defendants discretion or power to impose or modify fees, Defendants abused such discretion and exercised such discretion in bad faith through their conduct alleged herein.

59.     Plaintiff and all Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Defendants.

60.     As a direct result of Defendants' breaches, Plaintiff and the members of the Class sustained damages.

61.     Absent injunctive relief, Defendants' contractual breaches alleged herein will continue.

## SECOND CLAIM FOR RELIEF

### Unconscionability

62.     Plaintiff repeats paragraphs 1 through 53 above.

63.     Defendants have imposed adhesive, unfair, and draconian terms in their contracts with Plaintiff and the Class.  Such terms include those making it extremely costly and practically impossible to obtain relief from Defendants' practices alleged herein.

64.     Such terms include those purporting to, or that Defendants may argue purport to, (a) require merchants to waive their right to a jury trial, (b) limit Defendant's liability, and (c) truncate the applicable statute of limitations for disputed charges.

65.     Defendants have also included provisions in their contracts with Plaintiff and the Class that purport to give Defendants certain rights to impose or modify fees at its discretion.

66.     Defendants' contracts with Plaintiff and the Class are, as a whole or in part, substantively and procedurally unconscionable.

67.     Defendants' contracts with Plaintiff and the Class are contracts of adhesion in that they are standardized form contracts, imposed and drafted by Defendants, the party of vastly superior bargaining strength, that only allow

Plaintiff and the Class members the opportunity to adhere to them or reject them entirely.

68.     Defendants' contracts with Plaintiff and the Class are deceptive, unfair, illusory, and misleading to any extent they could be read to otherwise allow Defendants to perpetrate the grossly improper acts described herein.

69.     Considering the great business acumen and experience of Defendants in relation to Plaintiff and the Class members, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, Defendants' contracts with Plaintiff and the Class are unconscionable and, therefore, unenforceable as a matter of law.

70.     Plaintiff and the Class members have sustained damages as a result of Defendants' unconscionable merchant contracts as alleged herein.

71.     Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

72.     Plaintiff repeats paragraphs 1 through 53 above.

73.     Plaintiff, on behalf of itself and the Class, asserts a common law claim for unjust enrichment.  This claim is brought in the alternative and is contingent on Defendants' contracts with Plaintiff and the Class being deemed ineffective, inapplicable, or unenforceable in whole or in part.  In either scenario, unjust enrichment will dictate that Defendants disgorge all fees unjustly received.

74.     By means of Defendants' wrongful conduct alleged herein, Defendants knowingly engaged in billing practices against Plaintiff and members of the Class that were unfair, unconscionable, and oppressive.

75.     Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Class.

76.     As a result of Defendant's wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

77.     Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

78.     It is inequitable for Defendants to be permitted to retain the benefits they have received, and are still receiving, without justification, from the imposition of illicit fees and charges on Plaintiff and members of the Class in an

unfair, unconscionable, and oppressive manner.  Defendants' retention of such funds constitutes unjust enrichment.

79.   The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class.  Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Class.

80.   Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment including:

A.   An order certifying this case as a class action, and appointing Plaintiff and its counsel to represent the Class;

B.   Declaratory and injunctive relief as set forth herein;

C.   An order awarding, as appropriate, compensatory damages, restitution, and disgorgement to Plaintiff and the Class;

D.   An order awarding attorneys' fees and costs;

E.   An order awarding pre- and post-judgment interest; and

F.   An order providing such further relief as this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury to the extent authorized by law.

Dated: November 16, 2016          Respectfully submitted,

*/s/ David S. Stellings*
David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY 10013
Tel: 212-355-9500

Roger N. Heller
California Bar No. 215348*
rheller@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN L.L.P.
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:  415-956-1000

E. Adam Webb
Georgia Bar No. 743910*
Adam@WebbLLC.com
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-0773

*Attorneys for Plaintiff*

\* Application for *Pro Hac Vice*
  Admission to be filed