**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZAM & ZAM SUPER MARKET, LLC, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>     v.<br><br>IGNITE PAYMENTS, LLC; FIRST DATA MERCHANT SERVICES CORPORATION; FIRST DATA MERCHANT SERVICES LLC; and FIRST DATA CORPORATION,<br><br>                Defendants. | Civil Action No.<br><br>2:16-CV-6370-SJF-AYS<br><br><br>**AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Zam & Zam Super Market, LLC ("Plaintiff" or "Zam Market"), by and through its undersigned counsel, on behalf of itself and the proposed Classes defined herein, files this Amended Class Action Complaint and alleges the following based on personal knowledge, documents and information provided by Defendants, investigation of counsel, and information and belief.

## INTRODUCTION

1.  This is a civil action seeking monetary damages, restitution, injunctive relief, and declaratory relief against Defendants Ignite Payments, LLC ("Ignite"),

First Data Merchant Services Corporation, First Data Merchant Services LLC, and First Data Corporation ("FDC") (collectively, "Defendants").

2.     In today's business world, most merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  To be able to accept these payment methods, merchants are required to engage a card processing company to provide and manage the various card-processing-related services.

3.     Defendants provide card processing services to businesses like Plaintiff, in exchange for fees paid by the merchants.  Defendants' customers rely on Defendants to treat them fairly.  The fees paid for card processing services are one of the largest expenses many merchants incur—typically the third largest expense, after labor and product costs.

4.     Defendants have systematically exploited their position of trust and power by unfairly and deceptively "cramming" Plaintiff and their other merchant customers with "optional" services that the merchants specifically declined and that provide no benefit to the merchants, including but not limited to a service known as "TransArmor."

5.     Although Defendants have concocted a defense for their "cramming"—a supposed notice letter and contractual amendment ("Amendment") that they purportedly sent to all then-existing customers in August of 2014—the

letter and Amendment were ineffective for multiple reasons described herein.  If they were effective, however, Defendants have abjectly and willfully failed to afford the benefits promised therein to Plaintiff and the Classes.

6.      Defendants' misconduct alleged herein violates the express terms of their form contracts (and the Amendment, if effective, as well) with Plaintiff and the Classes, and violates the implied covenant of good faith and fair dealing.

7.      As a direct result of Defendants' misconduct alleged herein, Plaintiff and the other members of the proposed Classes have been damaged by incurring improper charges, the amounts of which were seized by Defendants from customer accounts, and Defendants have been unjustly enriched at the expense of Plaintiff and the Classes.

## JURISDICTION AND VENUE

8.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 members of each of the proposed Classes, the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one member of each of the Classes is a citizen of a state different than at least one of the Defendants.

9.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within the State of New York, such that Defendants have significant, continuous, and pervasive contacts with this State.

10.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendants conduct business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district. Moreover, Defendants' form contracts with Plaintiff and the Classes specify this Court as the proper forum.

## THE PARTIES

11.     Plaintiff Zam Market is a small, independently-owned food market located in Dearborn, Michigan.  Zam Market has been in business since August 2013, and is a former customer of Defendants.

12.     Defendant Ignite is a California limited liability company.  Ignite is a "merchant acquirer" (explained further below) that was founded in 1988 as "Cardservice International."  The company changed its name to Ignite Payments in 2013.  As a limited liability company, Ignite is considered an "unincorporated association" for purposes of jurisdiction under the Class Action Fairness Act.  28 U.S.C. § 1332(d)(10).  Since its inception, Ignite has partnered with FDMC and FDC to provide processing services for the merchants it acquired.  FDC took a majority-ownership stake in Ignite in 1997 and assumed 100 percent ownership of Ignite in 2001.  Since that time, Ignite has been a wholly-owned subsidiary of FDC.

13.     Defendant First Data Merchant Services LLC is a Florida corporation with its principal offices located in Atlanta, Georgia.   Defendant First Data Merchant Services Corporation was the predecessor entity to First Data Merchant Services LLC, before the entity converted to an LLC in or around 2015.  First Data Merchant Services LLC and First Data Merchant Services Corporation are referred to collectively herein as "FDMS".  FDMS is one of the largest payment processing companies in the world, with annual revenues exceeding $10 billion.  FDMS is a wholly-owned subsidiary of Defendant FDC.

14.     Defendant FDC is a Delaware corporation with its principal offices located in Atlanta, Georgia.  FDC has called itself the "#1 Processor for U.S. merchant acquirers" and the "#1 Third-party processor for credit and private-label card issuers in the U.S."  It services over 6,000,000 merchant locations worldwide, and over 4,000,000 in the U.S. alone.  FDC and its affiliates process nearly half of all credit and debit card transactions in the U.S

## FACTUAL ALLEGATIONS

**The Card Processing System**

15.     The card processing system is complex and involves many parties.  In addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).     The Card Issuer –  the company that issued the credit or debit

card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one of its cards for a transaction. These companies charge fees that are usually calculated as a percentage of a transaction price plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). These fees are generally known as "interchange rates." These fees vary based on the type of card used. For example, card issuers may charge a higher fee for transactions involving a "rewards" credit card than a card with no rewards program.

(b). <u>The Card Network</u> – the card networks (*i.e.*, Visa, MasterCard, Discover, American Express) also charge per transaction fees. By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee. The card networks also charge various additional fees depending on the type of transaction. These fees are generally known as "assessments."

(c). <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited and the merchant's account is credited. Defendant FDMC is a payment processor, and in fact is one of the largest payment processors in the world.

6

(d).   The Member Bank – only banks, such as Wells Fargo Bank, N.A., may be members of card networks.   These member banks "sponsor" payment processors so they may process transactions through the card networks.

(e).   The Merchant Acquirer – this is the company that markets the payment processor's services to merchants, or aggregates the merchant accounts opened by Independent Sales Organizations ("ISOs").   ISOs are also known as Member Service Providers ("MSPs").   Merchant acquirers essentially act as a "middle man" between merchants and payment processors.   They enroll merchants in payment processing services, provide customer support to the merchant, and handle monthly billing and collections.   Defendant Ignite is a merchant acquirer and ISO/MSP.   For example, it refers to itself as "a registered ISO/MSP of Wells Fargo Bank, N.A."

16.   Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment contracts with an ISO/MSP to obtain such services.   This contract sets forth the fees that the merchant will be charged, which commonly consist of two parts:

(a).   "Pass Through" Costs – these charges consist of the "interchange rates" imposed by card issuers and the "assessments" imposed by card networks.   These costs are set in amount, some as a percentage rate of the transaction amount plus per-transaction fees (e.g., 1.95% + .10 dollars per

transaction) and some as strictly per-transaction fees (e.g., .0195 dollars (about two cents) per transaction), and are "passed through" to the merchant on their monthly billing statement.

(b).   <u>Payment Processing Fees</u> – these are the fees that the merchant is charged by the payment processor and/or merchant acquirer for payment processing services.  For interchange plus pricing plans, the payment processing fees are calculated and broken out separately from the pass through costs imposed by card issuers and networks.  For flat rate and tiered pricing plans, the payment processing fees and pass through costs are typically integrated together.  Payment processing fees are governed by the contracts between merchants, on the one hand, and the payment processor and/or merchant acquirer, on the other hand.  Some are flat amounts (e.g., $10 Monthly Customer Service Fee), others are per-transaction fees (e.g., six cents ($.06) per transaction).  These fees, too, should be reflected on the merchant's monthly billing statement.

17.   Given the complex nature of, and the numerous entities involved in, the card processing system, merchants must rely on companies like Defendants to provide and manage card processing for them.

18.   Plaintiff Zam Market and the other merchants in the proposed Classes each engaged Defendants to provide and manage card processing services for them.

8

**Defendants' Merchant Agreement and Program Guide**

19.     To engage Defendants' services, merchants are required to complete and sign a form Merchant Processing Application and Agreement ("Merchant Agreement").   A redacted copy of Plaintiff's Merchant Agreement is attached hereto as **Exhibit A**.   The Merchant Agreement is a standard form contract of adhesion, drafted by Defendants, that sets forth the services that will be provided to the merchant and the exact fees that Defendants will charge the merchant.

20.     The Merchant Agreement includes, in Section 8, a fee schedule for certain standard services that are mandatory (not optional).   The mandatory fees set forth in Section 8 include the "pass through" third-party charges discussed above, as well as the various payment processing fees that will be charged by Defendants, such as authorization fees, access fees, batch fees, chargeback fees, non-receipt of PCI validation fees, compliance services fees, and monthly customer service and account fees.

21.     The Merchant Agreement also includes—in a separate Section 9 entitled "Optional Services Fee Schedule"—certain "optional" services that the merchant can accept or decline, along with the fees that would be charged by Defendants for such services should the merchant elect to receive those particular services.

22.     For example, one of the "optional" services offered in Section 9 of the Merchant Agreement is TransArmor (hereinafter, "TransArmor"), a service provided by Defendants that they describe as:

> a dual-layered payment card security solution that combines software- or hardware-based encryption with tokenization technology. TransArmor secures the transaction from the moment of swipe – prior to transmission and throughout the payment process – with encryption and prevents card data from entering the merchant's card data environment (CDE) by replacing the primary account number (PAN) with a random-number token.

23.     Another "optional" item offered in Section 9 of the Merchant Agreement is the "Platinum Services Monthly Package," which is a "bundle" that includes TransArmor and other additional services such as "Offer Wise Solution," "SpendTrend analytics," and "Equipment Replacement Program."

24.     The Merchant Agreement incorporates by reference a document called the "Program Guide"—which is another form contract of adhesion drafted by Defendants and offered to merchants on a take-it-or-leave-it basis, is more than 50 pages in length, and sets forth various terms and conditions that apply to Defendants' provision of services to merchants.  A copy of Defendants' Program Guide is attached hereto as **Exhibit B**.

25.     Among other things, the Program Guide reiterates that TransArmor is an optional service, specifying that certain TransArmor-specific terms and conditions apply "if you elect to utilize the TransArmor Service."  Program Guide,

¶ 32.   Paragraph 32.6 of the Program Guide states: "You shall pay Processor the fees for TransArmor Service as set forth on the Application."

26.   The Program Guide, at Paragraph 19.1, limits fees to those "set forth in this Agreement (for purposes of clarity, this includes the Application and any additional pricing supplements or subsequent communications), all of which shall be calculated and payable pursuant to the terms this Agreement and any additional pricing supplements or subsequent communications."

27.   The Program Guide at Paragraph 19.1 states: "Subject to Section 24.3, we may also increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' prior to the effective date of any such change or addition."   An addendum to the Program Guide known as Part IV, however, limited adjustments to "initial MasterCard, Visa and Discover Network rates" to:

> a.   Any increases or decreases in the interchange and/or assessment portion of the fees;

> b.   The appropriate interchange level as is consistent with the qualifying criteria of each transaction submitted by Client;

> c.   Increases in any applicable sales or telecommunications charges or taxes levied by any state, federal or local authority related to the

delivery of the services provided by Ignite Payments, LLC[1] when such costs are included in the Service or other fixed fees.

**Execution of the Contract**

28.    To engage Defendants' services, merchants must indicate their agreement with the Merchant Agreement, including the incorporated Program Guide, by signing at the end of the Merchant Agreement.

29.    The Merchant Agreement by its own terms does not "take effect until Client has been approved and this Agreement has been accepted by Ignite Payments, LLC and Bank."  Exh. A, p. 5.  "Bank" appears to mean "Wells Fargo Bank, N.A."[2]   The Agreement includes a signature block for "Ignite Payments, LLC on behalf of itself and on behalf of Wells Fargo Bank, N.A. (for Visa and MasterCard transactions)."  *Id.*

30.    All parties to the Merchant Agreement are required to abide by the rules of the card networks, including Visa and MasterCard.  *E.g.*, Exh. B, p. 9, ¶ 1.8 ("Failure to comply with any of the Card Organization Rules may result in fines or penalties."); p. 24, ¶ 15 ("Subject to Card Organization Rules, Services may be performed by us . . ."); p. 24, ¶ 16 ("You are responsible for staying

---

[1] References to Ignite, as quoted here and elsewhere from the Program Guide or Merchant Agreement, are replaced by FDS where a merchant is signed up by another ISO/MSP or merchant acquirer.  Ignite's name is simply replaced by that of the applicable company.

[2] Similar to note 1 above for Ignite, references to Wells Fargo, N.A. are replaced with the name of other member banks where applicable.

apprised of all applicable changes to the Card Organization Rules and maintaining compliance with the Card Organization Rules."); p. 39, ¶ 38.9.

31.     Pursuant to the card network rules, Wells Fargo was required to sign the Merchant Agreement.  Defendants' Confirmation Page states: "The Bank must be a principal (signer) to the Agreement."  Exh. B, p. 57, ¶ 10.

32.     The applicable rules of the card networks repeatedly confirm that Wells Fargo was required to sign the Merchant Application for a binding contract to have been formed.  *E.g.,* MasterCard Rules, § 7.6.1 (stating that all merchant agreements must be "signed by the Customer," with "Customer" defined to include the member bank).  Further, MasterCard requires the contract to state: "The Merchant Agreement is not effective and may not be modified in any respect without the express written agreement of the Customer."  *Id.* at § 7.6.1(1)(b). MasterCard specifically prohibits that the contract "take effect or imply that it takes effect prior to being signed by the Customer."  *Id.* at § 7.6.1(3).  Pursuant to MasterCard Rule 5.1, Defendants and Wells Fargo could be subject to an "assessment up to USD 2,500 per day" for **each day** they are not in compliance as to **each merchant**.

33.     Notably, it is also true that no **changes** can be made to the Merchant Agreement without the written consent of Wells Fargo.  *E.g.,* MasterCard Rules, § 7.6.1(1)(b).

**Defendants Systematically Crammed Plaintiff Zam Market and Other Merchants with "Optional" Services They Expressly Declined.**

34.     Shortly after Plaintiff Zam Market opened for business in August of 2013, it was approached by an agent of Defendants.  At that time, Plaintiff did not accept credit or debit card payments.  The agent informed Plaintiff that Defendants could process debit and credit card payments for Plaintiff at a low cost.  The agent presented the form Merchant Agreement to Plaintiff.

35.     Plaintiff engaged Defendants' services in August 2013.  Exh. A, pp. 5-6.

36.     Notably, despite the requirements of the Merchant Agreement, Program Guide, and applicable card network rules, on information and belief, neither Defendants nor Wells Fargo signed the Agreement.

37.     Plaintiff did not desire to receive any of the "optional services" listed in Section 9 of the Merchant Agreement (including TransArmor), which Plaintiff deemed unnecessary and excessive.  Plaintiff's intent not to receive these services is manifested in Plaintiff's Merchant Agreement itself.   In the Merchant Agreement that it signed, Plaintiff declined the "optional" TransArmor service, and likewise declined the "optional" Platinum Services Monthly Package.  *See* Exh. A, pp. 3-4.

38.     After entering into the Merchant Agreement, and starting to conduct business with Defendants, Plaintiff began receiving monthly statements from

Defendants.  For several months, Plaintiff closely reviewed in detail the statements each month.  Although the statements were formatted in a manner that made it difficult for Plaintiff to determine if the charges being assessed by Defendants were proper, the charges appeared to Plaintiff to be legitimate.

39.    On October 31, 2014, a little more than a year after Plaintiff first engaged Defendants' services, and unbeknownst to Plaintiff, Defendants began assessing a $19.95 monthly fee on Plaintiff for the TransArmor service, debiting such fee directly from Plaintiff's bank account each month.  Thus, Defendants began unilaterally cramming a hefty monthly fee for an "optional" service that Plaintiff not only never requested, but had in fact *specifically declined* in the Merchant Agreement.

40.    Defendants imposed the improper and unauthorized $19.95 monthly TransArmor charge on Plaintiff for more than 20 months without Plaintiff's knowledge or consent.  It was only when Plaintiff obtained the assistance of a payment processing expert that it was alerted to these improper and unauthorized charges.  After learning of these charges, Plaintiff promptly terminated its relationship with Defendants.

41.    Not only had Plaintiff specifically declined the TransArmor service, Plaintiff never received any information explaining how Plaintiff could use or benefit from TransArmor.  In fact, Plaintiff never received any benefit from the

TransArmor service despite being charged for the service for numerous months. Plaintiff never "registered" for TransArmor,[3] nor did it ever receive any encryption key for TransArmor, both of which would have been necessary in order for Plaintiff to even have any possibility of receiving any benefit from the service.

42.     A review of Plaintiff's historical statements reveals that in the September 2014 statement, Defendants buried the following language (in much smaller font that shown here):

> Great News! Your business now has the expanded security of the TransArmor Solution that helps protect you from the significant costs of a data breach and helps you stay ahead of continually changing industry requirements. You should have received a package in the mail with all the details.   Call us at 866-359-0978 or go to ignitepayments.com/transarmor to register.

43.     This language was included in the middle of several other dense paragraphs and was formatted in such a manner so that it drew as little attention as possible.

44.     Even if Plaintiff had seen this buried statement language (or received the package in the mail that the statement's language *incorrectly* asserts had been received), given that Plaintiff had expressly declined TransArmor in the Merchant Agreement and had never "registered" for the service, a reasonable reading of the language would have been that TransArmor was being made available to Plaintiff

---

[3] "Registration" is a distinct, additional step, separate from signing up for TransArmor, that is necessary in order to use and receive any benefit from TransArmor.

free of charge (or least that there would be no charge absent Plaintiff's affirmative consent to receive the service and registration for the service).

45.  Plaintiff's experience in this regard is not unique.

46.  The complexity of the card processing business makes it difficult for merchants to understand whether card processing companies like Defendants are charging them only the fees that are allowed by their contracts.  The difficult to understand monthly statements sent by Defendants also made it difficult for Plaintiff and the other merchants in the Classes to understand whether Defendants were charging them only the fees that were allowed by their contracts with Defendants.

47.  Defendants have systematically taken advantage of this confusion, luring in merchants like Plaintiff Zam Market with the promise of straightforward, transparent pricing, and then exploiting their position of power and control to sneak in improper and unauthorized charges, including charges for "optional" services that the merchants specifically declined and that provide them no benefit.

48.  For example, Defendants unilaterally crammed Plaintiff Zam Market and other merchants with the TransArmor service, charging them as much as $19.95 each month for the so-called service, even though the merchants specifically declined TransArmor in their Merchant Agreements and never used TransArmor.

**Defendants Purport to Legitimize Their Cramming by Amending the Merchant Agreement.**

49.     After this case was filed, Defendants offered their defense of the cramming of TransArmor on customers who had already declined the service. Defendants contend that the fees are justified because, in August of 2014, a letter and enclosed Amendment were sent to all U.S. customers.   A copy of the correspondence Defendants contend was sent to Zam Market is attached hereto as **Exhibit C**.

50.     Zam Market did not receive the letter or Amendment.  In August of 2014, Zam Market made a regular practice of receiving and checking the U.S. mail but there is no record of receiving Exhibit C and no one at Zam Market remembers receiving such a document.

51.     Nevertheless, the letter and enclosure offer no support for Defendants' cramming of the previously-rejected TransArmor service.

52.     First, the letter does not provide adequate notice of the new fee.  On information and belief, the envelope was nondescript, similar to dozens of pieces of standard junk mail received by small businesses each week.[4]  The first page of the letter clearly implies that an optional service is being offered.   The few customers that opened the envelope would justifiably have thrown it away after

---

[4] A copy of the envelope has not been provided by Defendants but counsel for Defendants has described its bland nature.

reading the first two paragraphs, which appear to be promoting a new service that, if not of interest to the customer, can be disregarded—particularly so for Plaintiff and the proposed Cramming Class, all of whom had already specifically declined TransArmor previously.  Only in the third paragraph does the letter reveal that "TransArmor Solution is now automatically a feature of your account."  Still, since no downside (the fee) has been mentioned to this point of the letter, there was no reason for a merchant to be concerned or to keep reading.

53.    Next the letter states that "to fully activate all the benefits of the TransArmor Solution", the merchant has to go online and register.  As Defendants well know, the vast majority of their customers who were crammed with TransArmor never actually registered and thus could receive no benefit from TransArmor.  Zam Market never registered.

54.    Indeed, for many merchants, TransArmor was not even functional with their equipment.  Thus, they could not have used the so-called service even if they had registered.

55.    Only on page two of the letter did Defendants reveal the "low, monthly charge of $19.95 for the TransArmor Solution beginning on October 1st."

56.    Page two of the letter provided that customers could opt-out of ("cancel") the crammed TransArmor service by contacting Defendants within approximately one month.  Of course, Plaintiff and every member of the proposed

Cramming Class had already specifically declined the same or effectively the same TransArmor service.  Moreover, importantly, merchants were intentionally discouraged by Defendants from opting-out (again, that is) of the crammed TransArmor service because Defendants stated that TransArmor would "replace any regular monthly or annual compliance fee or per-transaction fees that you may be paying."  The word "replace" was underlined in the letter to add emphasis to the prospect of these savings.  A prorated credit for any already-paid annual fees was to be given.

57.    Since for most merchants, including Zam Market, "monthly and annual compliance fees" and "per-transaction fees," which were supposedly being replaced, far exceeded $19.95 per month, there was yet another reason that they would not call the number shown on page two to yet again opt-out of the service.

58.    At the very bottom of the letter, in a footnote, Defendants stated: "If your PCI Compliance is not validated annually, a PCI non-validation fee of $19.95 per month will apply."[5]

59.    The letter enclosed a document entitled "Amendment to Processing Agreement" which purported to actually change the terms of the Merchant

---

[5] Because the letter earlier stated that all "monthly or annual compliance fees" were replaced by TransArmor, Defendants appear to have intentionally misled or confused their customers by stating one thing earlier in the body of the letter and then something apparently inconsistent later.

Agreement.  The Amendment first lists the various "services" purportedly included with TransArmor, one of which is "PCI Compliance Services."

60.     Page two of the Amendment lists the new monthly fee as $19.95 and states that such fee "will replace your current annual and monthly compliance fee which will not apply."  The prorated credit for annual compliance fees is provided for.  The Amendment continues: "The TransArmor Solution Fee will also replace any transaction fees for current TransArmor functionality."   Importantly, this language differs from the letter, which promised—in order to dissuade merchants from opting-out of the crammed TransArmor service—to replace all "per-transaction fees."   Since the verbiage "transaction fees for current TransArmor functionality" is amorphous and undefined, it is reasonable to hold Defendants to their definition and interpretation from the notice letter, that is that all "per-transaction fees" were to be replaced.

61.     The Amendment goes on to reinstitute a "PCI Non-Compliance Fee" but states that the amount "will be changed to $19.95 per month."  Zam Market had been paying $24.95 for the monthly PCI Non-Compliance Fee so, even if it had received and read the letter and Amendment, it would *at the very least* have believed there to be a benefit of saving $5 on its monthly PCI Non-Compliance Fee by not opting-out of TransArmor.  With these savings, and the end of per-transactions fees and compliance fees, Zam Market would actually have paid less

21

fees to Defendants under the scenario Defendants portrayed in the letter/Amendment.

62.    The letter and Amendment, however, were likely not effective for at least three reasons.  First, the bank was not a party to the Amendment and no changes to the Merchant Agreement could be made—both by its own terms and the incorporated requirements of the card networks—without the written consent of the bank.

63.    Second, the letter was intentionally misleading, and provided ineffective notice of an important contractual change.  The envelope and text of the letter were designed to ensure that merchants were unlikely to read the letter or the Amendment, and also to ensure that those merchants who did read them would believe the changes represented a net savings in fees, would not understand that a new fee was being imposed, and would not opt-out of TransArmor.  Defendants cannot properly rely on an intentionally misleading "notice" as a basis for cramming this unwanted service on Plaintiff and other merchants.

64.    Third, for Plaintiff and the numerous other merchants who had specifically rejected the TransArmor service at the time of contracting, Defendants were already fully on notice that they had opted-out of this so-called service.  Moreover, since TransArmor was useless until a merchant registered through the website, and Plaintiff and the vast majority of other customers did not affirmatively

register, and many lacked equipment that was also needed to receive any benefit from TransArmor, Defendants knew full well that these merchants did not want the service.

**Defendants Fail to Honor the Letter and Amendment.**

65.    To the extent any enforceable bargain was struck when the letter and Amendment were sent to customers, it was that the customers would pay the new fee and Defendants were to remove numerous other fees, including all compliance fees and all per-transaction fees.

66.    Defendants, however, failed to "replace any regular monthly or annual compliance fee or per-transaction fees that you may be paying."  To the contrary, for the month of October of 2014 (after the TransArmor service was imposed) and for many months beyond that, Zam Market continued to be assessed ***all of the fees it had been paying AND the new TransArmor fee***.

67.    For example, Defendants continued to assess various per-transaction fees, including these items taken verbatim from the statement for October of 2014: "CREDIT CARD BATCH SETTLEMENTS 28 SETTLEMENT FEES AT .110000 -3.08;" "PIN-DEBIT BATCH SETTLEMENTS 26 SETTLEMENT FEES AT .110000 -2.86;" "MASTERCARD AUTH FEE 26 TRANSACTIONS AT .060000 -1.56;" "VISA AUTH FEE 41 TRANSACTIONS AT .060000 -2.46;" "AMEX AUTH FEE 1 TRANSACTIONS AT .060000 -0.06;" "VISA ACCESS

FEE 41 TRANSACTIONS AT .029400 -1.21;" "MASTERCARD ACCESS FEE 26 TRANSACTIONS AT .029400 -0.76;" "GEN. DEBIT TRANSACTION FEE 58 TRANSACTIONS AT .100000 -5.80."  Other per-transaction fees were also assessed but cannot be discerned with certainty from Defendants' monthly statement.  Zam Market was, however, charged at least $17.79 in per-transaction fees that should have been waived since it was also charged a $19.95 for: "TRANSARMOR SOLUTION – MONTHLY."

68.    It was no one-month mistake that Zam Market continued to be charged per transaction fees.  For the following month, November of 2014, Zam Market was assessed the following per-transaction fees: "CREDIT CARD BATCH SETTLEMENTS 26 SETTLEMENT FEES AT .110000 -2.86;" "PIN-DEBIT BATCH SETTLEMENTS 20 SETTLEMENT FEES AT .110000 -2.20;" "MASTERCARD AUTH FEE 19 TRANSACTIONS AT .060000 -1.14;" "VISA AUTH FEE 48 TRANSACTIONS AT .060000 -2.88;" "DISCOVER AUTH FEE 2 TRANSACTIONS AT .060000 -0.12;" "DISCOVER ACCESS FEE 2 TRANSACTIONS AT .029400 -0.06;" "VISA ACCESS FEE 48 TRANSACTIONS AT .029400 -1.41;" "MASTERCARD ACCESS FEE 19 TRANSACTIONS AT .029400 -0.56;" "GEN. DEBIT TRANSACTION FEE 50 TRANSACTIONS AT .100000 -5.00."  Once again, other per-transaction fees were also assessed but cannot be discerned with certainty from Defendants'

monthly statement.  Zam Market was, however, charged at least $16.23 in per-transaction fees that should have been waived since it was also charged a $19.95 fee for: "TRANSARMOR SOLUTION – MONTHLY."

69.    Such assessments of per-transaction fees continued for the duration of Zam Market's time as a customer of Defendants.

70.    Zam Market also continued to be charged for monthly and annual compliance fees despite the promises made in the letter and Amendment.  For example, for October of 2014 and in each month thereafter, Zam Market was assessed a PCI Non-Compliance Fee (listed in the statements as a "Non-Receipt of PCI Validation Fee") in the amount of $24.95.

71.    In December of 2014, three months worth of Zam Market's annual compliance fee was refunded, in the amount of $29.75.  It appears that this amount was calculated by taking $119 (the amount paid in December of 2013 for the annual compliance fee), dividing it by 12, and multiplying by 3, to refund the amounts for October – December after the new fee went into effect.

72.    Shockingly, however, even though the letter and Amendment had promised an end to compliance fees, in December of 2014, Zam Market was again charged $119 for "ANNUAL COMPLIANCE SVC FEE."

73.    Even if Defendants are given the benefit of all doubt and monthly PCI Non-Compliance Fees could continue to be charged, they were most certainly capped at $19.95 per month.  Both the letter and the Amendment had so provided:

> Non-Compliance Fee. The fee for your failure to provide us receipt of your validation of compliance with your PCI DSS standards as required under your Processing Agreement ("Non-Validation Fee") will be changed to $19.95 per month. If you have opted-out as set forth above, the monthly Non-Validation Fee will remain the same under your Processing Agreement.

Amendment, p. 2, ¶ 2(b).  Nevertheless, for the duration of its time as a customer of Defendants, Zam Market continued to be billed *$24.95* each month for PCI Non-Compliance Fees (listed in the statements as "Non-Receipt of PCI Validation Fee)," meaning, even if Defendants' letter and Amendment were effective, Defendants violated this term as well as the others described above.

74.    Based on the continued charges for per-transaction fees and compliance fees, and the failure to lower Zam Market's monthly PCI Non-Compliance Fee, it appears that Defendants chose not to honor any of the aspects of the TransArmor-related changes in 2014 that were supposed to be positive for the customer.  They did charge the $19.95 TransArmor Solution Fee every month thereafter, however, and, since counsel for Defendants has confirmed that Defendants did enroll Zam Market in TransArmor, it appears that Defendants violated their own letter and Amendment.

75.    Defendants knew full well that very few merchants would receive, open, and/or comprehend the import of the letter and Amendment.  Even if a merchant did receive, open, and read the notice, they were likely to believe Defendants' promise that various fees would be replaced by the TransArmor fee, which would actually result in a lower total amount of monthly fees.  Since no fees were actually eliminated or reduced by Defendants, the TransArmor fee was simply extra profit that went directly to Defendants' bottom line.

76.    Defendants claim that all customers were automatically enrolled in TransArmor in the Fall of 2014.  They assert that they did not cram customers that signed up after that date, but rather that any customers signing up after August of 2014 would have had their wishes as to TransArmor honored.  In other words, Defendants contend they did not cram the TransArmor service on all new customers after August of 2014, but that this was a one-time account revision for all accounts in existence as of that time.  If this were true, of course, those rejecting TransArmor after August of 2014 would never have been subject to the TransArmor fee.

77.    After August of 2014, Defendants' form Merchant Application continued to list TransArmor as an "Optional Service," which merchants could decline.

27

78.    Upon information and belief, however, customers applying after August of 2014 who rejected TransArmor on their Merchant Application continued to be crammed with TransArmor by Defendants.    That is, customers who specifically rejected TransArmor on the then-current version of Defendants' contract, continued to have the TransArmor fee added to their monthly billings in 2015 and 2016.

79.    Plaintiff Zam Market and other merchants that Defendants crammed with TransArmor could not have received any benefit from this unwanted service. To actually use and receive any benefit from TransArmor, a merchant needs to: (a) "register" for TransArmor (registration is distinct from signing up for TransArmor, and happens after the merchant is signed up for the service); and (b) have access to an encryption key that Defendants provide to TransArmor registrants.    On information and belief (and based on personal knowledge as to Plaintiff) the vast majority of merchants that Defendants crammed with TransArmor have not registered for TransArmor and/or have not received the encryption key.

80.    Defendants' improper and unauthorized charges alleged herein were imposed by Defendants in a deceptive manner, and designed by Defendants so that the charges would go unnoticed by merchants for months or longer.  Among other things, Defendants lulled unsuspecting merchants into a false sense of comfort by timing the cramming of unwanted services so that they occur several months after

the merchants begin conducting business with Defendants, and thus after the merchants have already received and reviewed multiple monthly statements (without unwanted services) from Defendants.  Moreover, when the crammed services and improper charges are imposed by Defendants, Defendants provide inadequate and deceptive disclosure, which even if noticed by the merchant, falsely suggest that the services were requested by the merchant, are non-optional, and/or are being provided free of charge.

81.    Defendants' misconduct alleged herein has been systemic and a matter of corporate practice.

82.    For those merchants that eventually figure out they have been subject to these improper charges by Defendants, and raise the issue with Defendants, Defendants unfairly use the Merchant Agreement's early termination clause—which requires the merchant to pay hefty fees to get out of the relationship (*see, e.g.,* Exh. A, Confirmation Page, § 8)—as a hammer to dissuade these cheated customers from terminating their relationship with Defendants.

## **CLASS ALLEGATIONS**

83.    Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of the following three proposed classes:

> All customers of Defendants in the United States that were assessed a fee for TransArmor, or another optional service, that had previously been declined ("Cramming Class").

All customers of Defendants in the United States that did not opt-out of the TransArmor Solution enrollment and were assessed compliance or per-transaction fees after October 1, 2014 ("Amendment Breach Class").

All customers of Defendants in the United States that did not opt-out of the TransArmor Solution enrollment and were assessed a PCI Non-Compliance Fee in an amount greater than $19.95 after October 1, 2014 ("PCI Class").

84.    Plaintiff reserves the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as the Court may otherwise allow.

85.    Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which any Defendants have a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

86.    The members of the Classes are so numerous that joinder is impractical.  Defendants serve over 4,000,000 merchant locations in the United States.  Counsel for Defendants has confirmed that all customers as of August 2014 were mailed a substantively identical letter and Amendment as was Plaintiff. Therefore, each Class consists of at least many thousands of members, the identity of which is within the knowledge of Defendants and can be ascertained from Defendants' records.

87.     The factual basis of Defendants' misconduct is common to members of the Classes, and represents a common thread of conduct resulting in injury to all members of the Classes.  There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.  Among the questions of law and fact common to the Cramming Class are:

(a).    Whether Defendants charged Plaintiff and the Cramming Class for optional services that they declined;

(b).    Whether Defendants charged Plaintiff and the Cramming Class fees that were not authorized by their contracts;

(c).    Whether Defendants abused their contractual discretion and/or power in cramming services and corresponding charges on Plaintiff and the Cramming Class;

(d).    Whether Defendants acted in bad faith;

(e).    Whether Defendants' contracts with Plaintiff and the Cramming Class included unconscionable or otherwise unenforceable provisions;

(f).    The proper method(s) by which to measure damages and/or restitution for Plaintiff and the Cramming Class; and

(g).    Whether Plaintiff and the Cramming Class are entitled to injunctive and/or declaratory relief.

88.    Among the questions of law and fact common to the Amendment Breach Class are:

(a).    Who was mailed or sent the letter and enclosed Amendment;

(b).    Was the Amendment effective in altering the contract despite the various deficiencies;

(c).    Is Defendants' interpretation of the Amendment to replace all per-transaction fees binding;

(d).    What fees are compliance fees;

(e).    Whether Defendants' contracts with Plaintiff and the Amendment Breach Class included unconscionable or otherwise unenforceable provisions;

(f).    The proper method(s) by which to measure damages and/or restitution for Plaintiff and the Amendment Breach Class; and

(g).    Whether Plaintiff and the Amendment Breach Class are entitled to injunctive and/or declaratory relief.

89.    Among the questions of law and fact common to the PCI Class are:

(a).    Who was mailed or sent the letter and enclosed Amendment;

(b).    Was he Amendment effective in altering the contract despite the various deficiencies;

(c).    Which merchants were subject to a PCI Non-Compliance Fee greater than $19.95 after October 1, 2014;

(d).    Whether Defendants' contracts with Plaintiff and the PCI Class included unconscionable or otherwise unenforceable provisions;

(e).    The proper method(s) by which to measure damages and/or restitution for Plaintiff and the PCI Class; and

(f).    Whether Plaintiff and the PCI Class are entitled to injunctive and/or declaratory relief.

90.    Plaintiff's claims are typical of the claims of other members of the Classes in that they arise out of the same wrongful policies and practices and the same or substantially similar unconscionable contractual provisions.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Classes.

91.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

92.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due

to the financial resources of Defendants, most Class members could not afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

93.    Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

94.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants.

95.    Defendants refuse to correct their conduct and such inaction is generally applicable to the Classes, thereby making appropriate final injunctive relief and/or declaratory relief with respect to the whole of each of the Classes.  Defendants continue to engage in the improper billing conduct alleged herein and

continue to enforce unconscionable or otherwise unenforceable contractual provisions in order to block Plaintiff and the Class members from seeking legal relief. Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

### FIRST CLAIM FOR RELIEF

### Declaratory Relief

### On Behalf of Plaintiff and All of the Classes

96.     Plaintiff repeats paragraphs 1 – 95 above.

97.     Class-wide declaratory relief is appropriate if a defendant has acted or refused to act on grounds generally applicable to the class.

98.     Defendants have established a contracting system through which they obtain merchant signatures on the Merchant Agreement but never conclude such agreements by signing the contract, obtaining the member bank's signature on the contract, and returning it to the merchant.

99.     By the plain terms of the Merchant Agreement, Program Guide, and incorporated applicable card network rules, however, signatures from Defendants and its member bank (e.g., Wells Fargo) are conditions precedent to the effectiveness of the Merchant Agreement and the Amendment.

100.    The Court should declare that Plaintiff and the members of the Classes have not waived any rights to rely on the signature requirement. Further,

for those members of the Classes who still process transactions through Defendants, the Court should declare that Defendants and their member banks cannot now sign such the Merchant Agreement or Amendment in an effort to make them effective.

101.   The Court should declare that the Amendment is not binding on Plaintiff and the members of the Classes.

102.   Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to the proposed merchant contract.

## SECOND CLAIM FOR RELIEF

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

### On Behalf of Plaintiff and All of the Classes

103.   Plaintiff repeats paragraphs 1 through 95 above.

104.   This claim will apply if the Merchant Agreement and/or the Amendment are deemed to be effective contracts.

105.   If the Merchant Agreement became effective, Defendants have breached its plain terms, including by imposing charges that were unauthorized, including but not limited to TransArmor fees and fees for other optional services that Plaintiff and the members of the Cramming Class declined.  Such conduct violated the provisions of Defendants' form contracts setting forth the services that

would be provided and the fees that would be charged, and also specifically violated Section 9 of the Merchant Agreement, which expressly defined TransArmor and other services as being "optional."  Plaintiff and the Cramming Class suffered damages as a result of direct breaches of contract.

106.   If the Amendment became effective, then Defendants breached its plain terms and thereby damaged Plaintiff and all members of the Amendment Breach and PCI Classes.  Plaintiff and the Amendment Breach and PCI Classes suffered damages as a result of direct breaches of contract.

107.   Additionally, New York law imposes upon each party to a contract the duty of good faith and fair dealing.[6]  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the spirit and substance of their contracts in addition to its form.  Evading the spirit of the bargain and abusing discretion and/or the power to specify terms constitute examples of violations of good faith in the performance of contracts.  Subterfuge and evasion violate the obligation of good faith in performance even when an actor

---

[6] The Program Guide, incorporated by reference in the Merchant Agreement, provides that New York law applies.

believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

108.   Defendants have breached the covenant of good faith and fair dealing through their conduct alleged herein, including by abusing their discretion and power under their contracts with Plaintiffs and the Classes and by performing under such contracts in a bad faith and deceptive manner.   To the extent Defendants' contracts with Plaintiff and the Classes purport to give Defendants discretion or power to impose or modify fees, Defendants abused such discretion and exercised such discretion in bad faith through their conduct alleged herein.

109.   Plaintiff and all Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Defendants.

110.   The contractual breaches alleged herein could not reasonably have been discovered by Plaintiff and the members of the Classes, including because of the length, confusing format, and otherwise difficult-to-read and interpret nature of the monthly statements sent by Defendants, and because Defendants failed to adequately disclose to customers the replacement of the compliance fees and per-transaction fees or the adoption of the $19.95 price for PCI Non-Compliance Fees.

111.   As a direct result of Defendants' breaches, Plaintiff and the members of the Classes sustained damages.

112.   Absent injunctive relief, Defendants' contractual breaches alleged herein will continue.

## THIRD CLAIM FOR RELIEF

### Unconscionability

### On Behalf of Plaintiff and All of the Classes

113.   Plaintiff repeats paragraphs 1 through 95 above.

114.   This claim will apply if the Merchant Agreement and/or the Amendment are deemed to be effective contracts.

115.   Defendants have imposed adhesive, unfair, and draconian terms in their contracts with Plaintiff and the Classes.  Such terms include those making it extremely costly and practically impossible to obtain relief from Defendants' practices alleged herein.

116.   Such terms include those purporting to, or that Defendants may argue purport to, (a) require merchants to waive their right to a jury trial, (b) limit Defendant's liability, and (c) truncate the applicable statute of limitations for disputed charges.

117.   Defendants have also included provisions in their contracts with Plaintiff and the Classes that purport to give Defendants certain rights to impose or modify fees at their discretion.

118.   Defendants' contracts with Plaintiff and the Classes are, as a whole or in part, substantively and procedurally unconscionable.

119.   Defendants' contracts with Plaintiff and the Classes are contracts of adhesion in that they are standardized form contracts, imposed and drafted by Defendants, the party of vastly superior bargaining strength, that only allow Plaintiff and the Class members the opportunity to adhere to them or reject them entirely.

120.   Defendants' contracts with Plaintiff and the Classes are deceptive, unfair, illusory, and misleading to any extent they could be read to otherwise allow Defendants to perpetrate the grossly improper acts described herein.

121.   Considering the great business acumen and experience of Defendants in relation to Plaintiff and the Class members, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, Defendants' contracts with Plaintiff and the Classes are unconscionable and, therefore, unenforceable as a matter of law.

122.   Plaintiff and the Class members have sustained damages as a result of Defendants' unconscionable merchant contracts as alleged herein.

123.   Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

### FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### On Behalf of Plaintiff and All of the Classes

124.   Plaintiff repeats paragraphs 1 through 95 above.

125.   Plaintiff, on behalf of itself and the Classes, asserts a common law claim for unjust enrichment.  This claim is brought in the alternative and is contingent on Defendants' contracts with Plaintiff and the Classes being deemed ineffective, inapplicable, or unenforceable in whole or in part.  This claim also will allow recovery if the Amendment is deemed ineffective.  In either scenario, unjust enrichment will dictate that Defendants disgorge all fees unjustly received.

126.  By means of Defendants' wrongful conduct alleged herein, Defendants knowingly engaged in billing practices against Plaintiff and members of the Classes that were unfair, fraudulent, unconscionable, and oppressive.

127.   Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Classes.

128.   As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Classes.

129.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

130.   It is inequitable for Defendants to be permitted to retain the benefits they have received, and are still receiving, without justification, from the imposition of illicit fees and charges on Plaintiff and members of the Classes in an unfair, fraudulent, unconscionable, and oppressive manner.   Defendants' retention of such funds constitutes unjust enrichment.

131.   The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Classes.   Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Classes all wrongful or inequitable proceeds.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Classes.

132.   Plaintiff and members of the Classes have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment including:

1.      An order certifying this case as a class action, and appointing Plaintiff and its counsel to represent the Classes;

2.      Declaratory and injunctive relief as set forth herein;

3.      An order awarding, as appropriate, compensatory damages, restitution, and disgorgement to Plaintiff and the Classes;

4.      An order awarding attorneys' fees and costs;

5.      An order awarding pre- and post-judgment interest; and

6.      An order providing such further relief as this Court deems proper.

Dated: January 30, 2017          Respectfully submitted,

*/s/ David S. Stellings*
David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
Michael Decker
New York Bar No. 5415732
mdecker@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY 10013
Tel: 212-355-9500

Roger N. Heller (Admitted *Pro Hac Vice*)
California Bar No. 215348
rheller@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN L.L.P.
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:  415-956-1000

E. Adam Webb  (Admitted *Pro Hac Vice*)
Georgia Bar No. 743910
Adam@WebbLLC.com
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-0773

*Attorneys for Plaintiff*

1336728.2