UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ZAM & ZAM SUPER MARKET, LLC,
Individually and on behalf of all others similarly
situated,

                    Plaintiff,

          - against -

IGNITE PAYMENTS, LLC, FIRST DATA
MERCHANT SERVICES CORPORATION,
FIRST DATA MERCHANT SERVICES, LLC,
FIRST DATA CORPORATION,

                    Defendants.
--------------------------------------------------------X

**FILED**
**CLERK**

2:54 pm, Oct 31, 2017

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM
AND ORDER**

CV 16-6370 (SJF) (AYS)

**FEUERSTEIN, District Judge:**

I.      PRELIMINARY STATEMENT

        Plaintiff, Zam & Zam Super Market, LLC ("Plaintiff"), brings the instant action on behalf

of itself and all others similarly situated[1] seeking monetary damages, restitution, injunctive relief

and declaratory relief against Defendants Ignite Payments, LLC ("Ignite"), First Data Merchant

Services Corporation ("FDMSC"), First Data Merchant Services, LLC ("FDMS") and First Data

Corporation ("FDC") (collectively, "Defendants") based upon claims of declaratory relief,

breach of contract, breach of the implied covenant of good faith and fair dealing,

unconscionability and unjust enrichment. *See generally* Amended Complaint ("Am. Compl.")

---

[1]      The Court interprets all factual allegations in the Amended Complaint as applying
equally to the named Plaintiff as well as the putative classes since Plaintiff asserts that "[t]he
factual basis of Defendants' misconduct is common to members of the Classes" and that
"Plaintiff's claims are typical of the claims of other members of the Classes in that they arise out
of the same wrongful policies and practices and the same or substantially similar unconscionable
contractual provisions."  Am. Compl. ¶¶ 87, 90.

[DE 32].  Presently before the Court is Defendants' motion to dismiss the Amended Complaint

in its entirety in accordance with Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which

relief may be granted.  *See* Notice of Motion [DE 49].  Plaintiff opposes the motion.

*See generally* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl.'s

Opp'n") [DE 49-7].  For the reasons that follow, Defendants' motion is GRANTED.

## II.   FACTUAL BACKGROUND

The following factual allegations have been taken from the Amended Complaint as well

as documents attached as exhibits thereto.  All facts alleged by the Plaintiff are assumed to be

true for purposes of deciding the motion to dismiss and are construed in a light most favorable to

the Plaintiff as the non-moving party.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d

471, 475 (2d Cir. 2009); *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012).

### A.  The Respective Parties

Plaintiff, Zam & Zam Super Market, LLC, is an "independently-owned food market

located in Dearborn, Michigan" which has been in operation since August 2013.  Am. Compl.

¶ 11.

Defendant Ignite, founded in 1988 as "Cardservice International," operates as a

"Merchant Acquirer,"[2] and "[s]ince its inception Ignite has partnered with FDM[S]C and FDC to

provide [credit / debit card] processing services for the merchants it acquired."  *Id*. ¶ 12.  In

1997, FDC became a majority owner of Ignite and in 2001 assumed complete ownership.  *Id*.

---

[2]    According to the Amended Complaint, a "Merchant Acquirer" is a "company that
markets the payment processor's services to merchants, or aggregates the merchant accounts
opened by Independent Sales Organizations ("ISOs"). ISOs are also known as Member Service
Providers ("MSPs"). Merchant acquirers essentially act as a 'middle man' between merchants
and payment processors. They enroll merchants in payment processing services, provide
customer support to the merchant, and handle monthly billing and collections."  Am. Compl.
¶ 15(e).

Defendant First Data Merchant Services, LLC is a "Florida [limited liability company] with its principal offices located in Atlanta, Georgia." *Id*. ¶ 13.  First Data Merchant Services Corporation was the predecessor entity to First Data Merchant Services LLC, before the entity converted to an LLC in or around 2015.  *Id*.  For clarity, both the predecessor and successor entities shall be referred to as "FDMS."  FDMS is a "wholly owned subsidiary of First Data Corporation." *Id*.  According to Plaintiff, FDMS "is one of the largest payment processing companies in the world, with annual revenues exceeding $10 billion." *Id*.

First Data Corporation, a Delaware corporation with its principal place of business located in Atlanta, Georgia, bills itself as the "#1 Processor for U.S. merchant acquirers" and the "#1 Third-party processor for credit and private-label card issuers in the U.S." *Id*. ¶ 14.  According to Plaintiff, FDC services over 6,000,000 merchant locations worldwide, and over 4,000,000 in the U.S. alone" and "its affiliates process nearly half of all credit and debit card transactions in the U.S." *Id*.

**B.  The Merchant Processing Agreement**

In the event a merchant seeks to utilize Defendants' card processing services, it is "required to complete and sign a form Merchant Processing Application and Agreement." *Id*. ¶ 19, Exhibit ("Ex.") A (Plaintiff's Merchant Processing Application and Agreement).  The Merchant Processing Application and Agreement ("MPA") is a "standard form contract . . . that sets forth the services that will be provided to the merchant and the exact fees that Defendants will charge the merchant." *Id*., Ex. A.  The MPA is divided into thirteen (13) separate sections each requiring specific information concerning the merchant as well as the terms and scope of services to be provided.  *Id*., Ex. A.

As is relevant here, Sections 8 and 9 set forth, respectively, a "Fee Schedule" and "Optional Services Fee Schedule." *Id.*, Ex. A.  The mandatory fees comprising Section 8 of the MPA include "'pass through' third-party charges[3] . . . as well as the various payment processing fees that will be charged by Defendants, such as authorization fees, access fees, batch fees, chargeback fees, non-receipt of PCI validation fees, compliance services fees, and monthly customer service and account fees." *Id.* ¶ 20, Ex. A.  In addition to the mandatory fees imposed under Section 8, certain optional services, with a concomitant fee, are outlined in Section 9.  *Id.* ¶ 21, Ex. A.

Section 13 of the MPA, entitled "Agreement Approval" encompasses certain disclosures including that the merchant "agrees to all terms of the MPA" and that "[t]his MPA shall not take effect until [merchant] has been approved and this Agreement has been accepted by Ignite Payments, LLC and Bank." *Id.*, Ex. A.  This section also includes signature lines for both the merchant as well as "Ignite Payments, LLC, on behalf of itself and on behalf of Wells Fargo Bank, N.A. (for Visa and MasterCard transactions)." *Id.* ¶¶ 28-29, Ex. A.[4]

**C.  The Program Guide**

The MPA refers to a separate document entitled the "Program Guide." *Id.* ¶ 24, Ex. A. Specifically, Section 13 of the MPA requires the merchant to acknowledge that it has "received and read . . . the Program Guide (which includes terms and conditions for each of the services,

---

[3]     According to the Amended Complaint, "Pass Through" charges "consist of the 'interchange rates' imposed by card issuers and the 'assessments' imposed by card networks. These costs are set in amount, some as a percentage rate of the transaction amount plus per-transaction fees . . . and some as strictly per-transaction fees . . . and are 'passed through' to the merchant on their monthly billing statement."  Am. Compl. ¶ 16(a).

[4]     In the definitional section of the Program Guide, the MPA is defined as "The Merchant Processing Application and Agreement *executed by the Client*, which is one of the documents comprising the Agreement."  Am. Compl., Ex. B (Program Guide) § 39 (Glossary) (emphasis added).

Operating Procedures, Third Party Agreement(s)[)] and a Confirmation Page [ ] and agrees to be bound by all provisions as printed therein as modified from time to time." *Id.*,    Ex. A.  The Program Guide itself states in the "Preface" that "[t]his Program Guide, your Merchant Processing Application and the schedules thereto (collectively, the "Agreement"[5]) . . . contains the terms and conditions under which Processor[6] and/or Bank and/or third parties, will provide services to you." *Id.*, Ex. B (Program Guide) (Preface).  In addition, the Program Guide's Preface further states that "[t]he provisions of this Agreement regarding . . . Non-Bank Services[7] constitute an agreement solely between you and Processor and/or third parties.  Bank is not a party to this Agreement insofar as it relates to . . . Non-Bank Services, and Bank is not responsible, and shall have no liability, to you in any way with respect to . . . Non-Bank Services." *Id.*

The Program Guide contains a section entitled "Fees; Adjustments; Collection of Amounts Due." *Id.*, Ex. B (Program Guide) § 19. Section 19.1 states, in part, that "[i]n consideration of the Services provided . . . [merchant] shall be charged, and hereby agree[s] to pay us any and all fees set forth in this Agreement . . . all of which shall be calculated and

---

[5]    "Agreement" is defined as "[t]he Agreements among the Client, Processor, and Bank, contained in the Application, the Program Guide, the Schedules thereto and documents incorporated therein, each as amended from time to time, which collectively constitute the Agreement among the parties."  Am. Compl., Ex. B (Program Guide) § 39 (Glossary)

[6]    "Processor" is defined as "[t]he entity identified on the Application (other than the Bank which provides certain services under the Agreement."  Am. Compl., Ex. B (Program Guide) § 39 (Glossary)

[7]    "Non-Bank Services" are defined as "Products and/or Services for which Bank is not responsible, or a party to, including American Express, PIN Debit Card, and Electronic Benefits Transfer Transactions, TeleCheck Check Services, Gift Card Services and Transactions Involving Cards from other Non-Bank Card Organizations . . . TransArmor, Wireless Global Gateway e4 Services, Global ePricing Services, Clover Service and other items as may be indicated in this Program Guide."  Am. Compl., Ex. B (Program Guide) § 39 (Glossary)

payable pursuant to the terms of this Agreement and any additional pricing supplements or subsequent communications." *Id.* ¶ 26, Ex. B § 19.1.  Likewise, section 19.5 states that "[s]ubject to Section 24.3, we may also increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' prior to the effective date of any such change or addition." *Id.* ¶ 27,[8] Ex. B § 19.5.  Moreover, section 19.11 stipulates that the merchant "agrees to promptly and carefully review your merchant statements or other documents provided or made available to you (physically, electronically or otherwise provided by Us or others) reflecting Card transaction activity, including activity in your Settlement Account,[9]  If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected or such shorter period as provided in the terms and conditions that govern such account.  If you notify us after sixty (60) days, we shall have no obligation to investigate or effect any adjustments." *Id.* § 19.11.

The Program Guide also consists of a "Confirmation Page" which "summarizes portions of [the] Agreement in order to assist [the merchant] in answering some of the questions [that] are most commonly asked." *Id.*, Ex. A.  Specifically, this summarization includes a subsection entitled "Important Member Bank Responsibilities," which states, in part, that "[t]he Bank must be a principal (signer) to the Merchant Agreement.  *Id.* ¶ 31, Ex. A.  In addition, the card networks have instituted certain Card Organization Rules, which, in part, state that Wells Fargo

---

[8]     The Amended Complaint erroneously references § 19.1 for this provision as opposed to § 19.5.

[9]     "Settlement Account," in turn, is defined as "[a]n account or account(s) at a financial institution designated by Client as the account to be debited and credited by Processor or Bank for Card transactions, fees, Chargebacks and other amounts due under the Agreement or in connection with the Agreement."  Am. Compl., Ex. B *Id.* § 39 (Glossary).

was required to sign the Merchant Application for a binding contract to have been formed.  *Id*.

¶¶ 32-33 (citing MasterCard Rules, § 7.6.1).

### D.  TransArmor Optional Services

The TransArmor Service,[10] which comprised one of the optional services offered in the

MPA, consisted of a

> a dual-layered payment card security solution that combines
> software or hardware-based encryption with tokenization
> technology. TransArmor secures the transaction from the moment
> of swipe – prior to transmission and throughout the payment process
> – with encryption and prevents card data from entering the
> merchant's card data environment (CDE) by replacing the primary
> account number (PAN) with a random-number token.

*Id*. ¶ 22.

Section 32 of the Program Guide, entitled "Special Provisions Regarding TransArmor

Services," sets forth "additional terms and conditions" in the event a merchant "elect[s] to utilize

the TransArmor Service[.]"  *Id*., Ex. B (Program Guide) § 32.  Significantly, the preamble to the

TransArmor Service terms and conditions makes clear that

> The TransArmor Service is provided to you by Processor and not
> Bank.  Bank is not a party to this Agreement insofar as it applies to
> the TransArmor Service, and Bank is not liable to you in any way
> with respect to such services.  For the purposes of this section, the
> words 'we,' 'our' and 'us' refer only to the Processor and not the
> Bank."

*Id*., Ex. B § 32.  Section 32.3 specifically limits the scope of the TransArmor Services to "only

Card transactions sent from you to us for authorization and settlement pursuant to the

Agreement."  *Id*., Ex. B § 32.3.  In the event the merchant elects this service, the "Processor will

provide an encryption key to [merchant] to be used to encrypt (make unreadable) Card data

---

[10]     The Program Guide explicitly utilizes the term "TransArmor Service" which is defined as
"those services described below and may be either TransArmor VeriFone Edition Service or
TransArmor Base Service as described below."  Am. Compl., Ex. B § 32.1

during transport of the authorization request from your point of sale to Processor's systems . . .
Processor will then generate or retrieve a unique, randomly generated token assigned to the Card
number that will be returned to you in the authorization response (the "Token")." *Id.*

### E. Plaintiff Utilizes Defendants' Card Processing Services

In August 2013, shortly after Plaintiff began its business operations, "it was approached
by an agent of Defendants . . . [who] informed Plaintiff that Defendants could process debit and
credit card payments for Plaintiff at a low cost." *Id.* ¶ 34. On August 23, 2013, Plaintiff
contracted with Defendants to provide card processing services. *Id.* ¶ 35, Ex. A (MPA).
According to Plaintiff, it "did not desire to receive any of the 'optional services' listed in Section
9 of the [MPA] (including TransArmor)" and that "Plaintiff declined the 'optional' TransArmor
service." *Id.* ¶ 37.[11]

After contracting with Defendants for card processing services, "Plaintiff began receiving
monthly statements from Defendants and [f]or several months, Plaintiff closely reviewed in
detail the statements" it received. *Id.* ¶ 37. Having reviewed its statements over the course of
"several months," Plaintiff determined that all imposed charges "appeared to [ ] be legitimate."
*Id.* ¶ 38. Nevertheless, on October 31, 2014, "a little more than a year after Plaintiff first
engaged Defendants' services, and unbeknownst to Plaintiff, Defendants began assessing a
$19.95 fee on Plaintiff for the TransArmor service, debiting such fee directly from Plaintiff's

---

[11]    Although Plaintiff states that it specifically "declined" the TransAmor Service and that
this declination is "manifested in [the] [MPA] itself," *id.* ¶ 37, such a characterization is not
entirely accurate since no affirmative declination of the TransArmor Service is evident in the
MPA itself. Rather, under the "TransArmor" heading in Section 9 of the MPA the box entitled
"token & encryption" is unchecked. As such, although Plaintiff asserts it somehow clearly or
unquestionably declined the TransArmor Service, the same is not borne out in the MPA itself. In
any event, since in adjudicating a motion to dismiss all plausible inferences must be drawn in
Plaintiff's favor, the Court will presume that the absence of an "x" in the "token & encryption"
indicates that Plaintiff declined the TransAmor Service.

bank account each month." *Id*. ¶ 39.  This charge was levied upon Plaintiff's account "for more

than 20 months" and Plaintiff asserts that "[i]t was only when Plaintiff obtained the assistance of

a payment processing expert that it was alerted to these improper and unauthorized charges."

*Id*. ¶ 40.  After being apprised of these charges, "Plaintiff promptly terminated its relationship

with Defendants." *Id*.

Plaintiff additionally claims that apart from "declin[ing] the TransArmor service, Plaintiff

never received any information explaining how Plaintiff could use or benefit from TransArmor."

*Id*. ¶ 41.  Upon review of its historical statements, Plaintiff asserts that the following notification

was "buried" in the September 2014 statement:

> Great News! Your business now has the expanded security of the
> TransArmor Solution that helps protect you from the significant
> costs of a data breach and helps you stay ahead of continually
> changing industry requirements. You should have received a
> package in the mail with all the details. Call us at 866-359-0978 or
> go to ignitepayments.com/transarmor to register.

*Id*. ¶ 42.  Nevertheless, Plaintiff asserts that it never received the "package" referred to in the

above notice and that, in any event, because it "declined TransArmor in the [MPA] . . . a

reasonable reading of the language would have been that TransArmor as being made available to

Plaintiff free of charge (or least that there would be no charge absent Plaintiff's affirmative

consent to receive the service and registration for the service)." *Id*. ¶¶ 44, 50; *but see*

Am. Compl., Ex. C (consisting of August 25, 2014 letter notifying Plaintiff of Defendants' "new,

enhanced TransArmor Solution" which "is now automatically a feature of your account" and for

which "[y]ou are already enrolled" and Amendment to Processing Agreement).

### F.  Defendants' TransArmor Solution Amendment to the Processing Agreement

In August 2014, Defendants introduced a "new, enhanced TransArmor Solution," which,

according to Defendants' August 25, 2014 notification letter, provides "some of the very best

data protection available" along with a "$100k liability waiver for card association expenses in the event of a breach." *Id.*, Ex. C. The letter further notifies the merchant that it is "already enrolled" and that "[t]o fully activate all the benefits of the TransArmor Solution, [the merchant should] visit [the First Data website] [ ] and register." *Id.* Moreover, the letter informed Defendants' customers that "[i]f you do not call to cancel TransArmor services and your business is processing transactions on or after October 1, 2014, we'll know that you've decided to keep the TransArmor Solution. Your transactions convey acceptance of these changes to your Agreement." *Id.*

The TransArmor Solution Amendment to the Processing Agreement (the "Amendment") specifically states that it

> amends your Merchant Processing Application and Agreement ("Processing Agreement") effective October 1, 2014. For the purposes of this Amendment, the words "we," "our" and "us" refer only to the Processor. The words "you" and "your" refer to the Merchant (also known as Client) as designated in your Processing Agreement.

The Amendment also explicitly details the overall scope of the TransArmor Solution, associated fees as well as cancellation of the service as follows:

### 1. *TransArmor Solution Services*

The scope of services, available to Defendants' customers as of October 1, 2014, is comprised on the following:

> a) **Prevention services** utilizing **(i) Data Protection** that provides encryption of card holder data at your payment environment and replaces the data with a token or randomly generated number and **(ii) Security Score** which provides you with a numerical value associated with your security risks based on elements such as industry type, PCI Level, PCI Compliance status and scanning results.

**b) Protection and detection services** for computer systems utilizing **POS Software Monitor** that provides : **(i) File** integrity monitoring designed to detect malicious software tampering with computer system files; **(ii) Anti-Virus software** designed to defend your computer against malicious software; **(iii) Card holder and personal information** scanning designed to detect card numbers or other sensitive customer data stored insecurely on your computer; **(iv) POS scanning** designed to identify which software (including version) you are using to make compliance validation easier; **(v)Unauthorized device monitoring** which monitors your local network and alerts you to devices that are unrecognized or that you have not approved; **(vi)Security configuration monitoring** which is designed to check your computers security settings so they are configured in compliance with PCI DSS; **(vii)Security health check** which is designed to check whether your computer is running essential security functions; and **(viii) Trusted Commerce Seal**, if you have an on-line business, which can be displayed on your website to reassure your customers that you are committing to protecting your customers' credit

**c) PCI Compliance Services** utilizing PCI Rapid Comply® **("PCI Rapid Comply Service")** that provides access to online PCI DSS Self Assessment Questionnaires (SAQ)to validate PCI data standards. If an internet scan is required to complete the SAQ, you will have access to such scanning services.

**d) Liability Waiver** which reduces your risk of liability in the event of a security breach when using the Services. It covers forensic investigation, Card Organization fines and Card Organization required equipment replacement up to $100,000 per location per program year, and a total aggregate of $500,000 per program year for all of your locations.

*Id*. Ex. C (Amendment) § 1 (Services).

### 2.  *TransArmor Solution & Non-Compliance Fees*

The Amendment states that "[t]he fee for access to the Services will be $19.95 per month ("TransArmor Solution Fee").  The TransArmor Solution Fee will replace your current annual or monthly compliance fee which will not apply (unless you have opted out as set forth above)."

*Id*., Ex. C § 2 (Fees).  In addition, the TransArmor Solution Fee "will also replace any

transaction fees for current TransArmor functionality" and that Defendants "may increase [the] fees for the Services as provided in [the] Agreement." *Id.*

This section also reemphasizes that the payment of fees "does not affect your compliance responsibilities and obligations associated with your Merchant Account" and that "[t]he fee for your failure to provide us receipt of your validation of compliance with your PCI DSS standards as required under your Processing Agreement ("Non-Validation Fee") will be changed to $19.95 per month.  If you have opted-out as set forth above, the monthly Non-Validation Fee will remain the same under your Processing Agreement." *Id.*

### 3. The "Opt-Out" Provision

The Amendment also specifically alerts the merchant that they are entitled to "opt-out" of the TransArmor Solution by contacting Defendants by October 1, 2014.  *Id.*, Ex. C § 1.  The specific provision appears in the Amendment as follows:

> IF YOU DO NOT WANT ACCESS TO THE TRANSARMOR SOLUTION SERVICES, YOU MAY OPT OUT BY CONTACTING US AT 866-359-0978 BY OCTOBER 1, 2014. IF YOU OPT OUT, YOU WILL NOT BE CHARGED THE TRANSARMOR SOLUTION FEE DESCRIBED IN SECTION 2 BELOW. HOWEVER, YOUR CURRENT ANNUAL OR MONTHLY COMPLIANCE FEE WILL CONTINUE TO BE IN EFFECT. IF YOU DO NOT OPT OUT, THE FEES BELOW WILL BE IN EFFECT STARTING OCTOBER 1, 2014.

*Id.* (emphasis in original).  In addition, the August 25, 2014 letter which accompanied the Amendment similarly provides that a merchant can "choose to cancel [the] service" by contacting the telephone number referenced by September 30, 2014."[12]  *Id.*, Ex. C (August 25,

---

[12]     While the Amendment itself provides that a customer may opt-out of the TransArmor Solution by October 1, 2014, the letter imposes an opt-out deadline of September 30, 2014. There is no explanation provided for this discrepancy.  In any event, since it is the Amendment itself (rather than the letter) that formally amends the Processing Agreement, *see* Am. Compl., Ex. C (Preamble), it appears the October 1, 2014 opt-out date would be controlling.

2014 Letter).  Likewise, the letter puts a  customer on notice that "[i]f you do not call to cancel TransArmor services and your business is processing transactions on or after October 1, 2014, we'll know that you've decided to keep the TransArmor Solution.  Your transactions convey acceptance of these changes to your Agreement."  *Id.*

#### 4.   *Plaintiff Asserts Notice of Amendment was Ineffective*

Notwithstanding the provision of the letter and accompanying Amendment, Plaintiff asserts that despite its regular business practices it "did not receive the letter or Amendment" and that in any event, "the letter does not provide adequate notice of the new fee."  *Id.* ¶ 50, 52; *see generally id.* ¶¶ 50-58 (setting forth reasons why Plaintiff asserts notice was inadequate). Specifically, Plaintiff states that the "letter and Amendment, however, were likely not effective" since (1) "the bank was not a party to the Amendment;" (2) "the letter was intentionally misleading, and provided ineffective notice of an important contractual change;" and (3) "Defendants were already fully on notice that [Plaintiff] had opted-out of this so-called service." *Id.* ¶¶ 62-64.

### G.  Plaintiff Asserts Defendants Failed to Abide by the Amended Fee Structure

According to Plaintiff, to the extent the Amendment was enforceable, Defendants failed to 'replace any regular monthly or annual compliance fee or per-transaction fees that you may be paying.'  To the contrary, for the month of October of 2014 (after the TransArmor service was imposed) and for many months beyond that, [Plaintiff] continued to be assessed all of the fees it had been paying and the new TransArmor fee."  *Id.* ¶¶ 65-66; *see also id.* ¶¶ 67-69. In addition, Plaintiff claims it "continued to be charged for monthly and annual compliance fees despite the promises made in the letter and Amendment."  *Id.* ¶ 70; *see also id.* ¶¶ 71-73.

### H. Plaintiff Discontinues Use of Defendants' Card Processing Services

Upon discovering that "Defendants imposed the improper and unauthorized $19.95 monthly TransArmor charge on Plaintiff for more than 20 months without Plaintiff's knowledge or consent . . . Plaintiff promptly terminated its relationship with Defendants." *Id*. ¶ 40.

### III.    DEFENDANTS' MOTION TO DISMISS

### A. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss.  District courts are to first "identify [ ] pleadings that, because they are no

more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555)).  Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully."  *Id*. at 678 (citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered "integral" to the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

## B.  Preliminary Issues

### 1.  *Consideration of Additional Materials*

As an initial matter, both parties have appended additional extrinsic documentation to their respective motion papers for the Court's consideration.  However, as the Court is only permitted to consider a narrow universe of documents outside of or otherwise attached to the

Complaint, *see ASARCO LLC*, 756 F.3d at 198, it is incumbent upon the Court to determine

whether these additional materials are properly considered in adjudicating the motion.

As part of its motion, Defendants have appended four (4) of Plaintiff's Card Processing

Statements from September 2014, October 2014, November 2014 and January 2015. *See* March

10, 2017 Declaration of Jonathan D. Polkes in Support of Defendants' Motion to Dismiss the

Amended Complaint ("Polkes Decl.") [DE 49-2], Exs. 1-4. Significantly, the Amended

Complaint specifically states that "Plaintiff closely reviewed in detail the statements each

month" and that Plaintiff "review[ed] [its] historical statements" while specifically referring to

the "September 2014 statement." Am. Compl. ¶¶ 38, 42. In addition, Plaintiff specifically

references certain fees that appeared on the October 2014 and November 2014 statements. *Id.*

¶¶ 67-68. Likewise, in paragraph 70 of the Amended Complaint, Plaintiff states that "for

October of 2014 and in each month thereafter, Zam Market was assessed a PCI Non-Compliance

Fee (listed in the statements as a 'Non-Receipt of PCI Validation Fee') in the amount of $24.95."

*Id.* ¶ 70. In light of these explicit references to Plaintiff's monthly statements, the Court finds

that the Card Processing Statements have been incorporated in the Amended Complaint by

multiple references and may therefore be properly considered. *See In re Thelen LLP*, 736 F.3d

213, 219 (2d Cir. 2013); *see also McKevitt v. Mueller*, 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010)

(recognizing that a court may consider "documents that the plaintiff relied on in bringing suit and

that are either in plaintiff's possession or that the plaintiff knew of when bringing suit").

In opposition, Plaintiff has attached three (3) specific documents: (1) an August 12, 2016

letter from Defendants; (2) excerpts from the MasterCard Rules; and (3) a sample of Defendants'

MPA. *See* April 7, 2017 Declaration of E. Adam, Webb in Opposition to Defendants' Motion to

Dismiss ("Webb Decl.") [DE 49-8], Exs. A-C. With respect to the August 12, 2016 letter, there

is no explicit reference made in the Amended Complaint to this correspondence nor is it evident from the face of the Amended Complaint that Plaintiff relied upon the document in bringing this action.  Moreover, the Court is not persuaded that this document is otherwise integral to the Amended Complaint.  Therefore, although Plaintiff makes direct reference to the letter in its opposition memorandum, *see* Pl.'s Opp'n at 23, "Plaintiff may not amend [its] complaint through [its] motion papers." *Yarborough v. Queens Auto Mall, Inc.,* No. 08–CV–3179, 2010 WL 1223584, at *2 (E.D.N.Y. Mar. 23, 2010) (citing *Wright v. Ernst & Young, LLP,* 152 F.3d 169, 178 (2d Cir.1998)); *see Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 330 (S.D.N.Y. 2010).  As such, the Court will not consider the letter in its adjudication of the motion.

Turning next to the excerpt from the MasterCard Rules attached to the Webb Declaration, as the Amended Complaint makes specific reference to and explicitly relies on the attached excerpt, *see* Am. Compl. ¶¶ 32-33, the Court finds the attached excerpt to be sufficiently incorporated into the pleading by reference and as such is properly considered.  *See, e.g.*, *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 525 (S.D.N.Y. 2010) (considering an insurance policy when the complaint "explicitly refer[ed] to, and relie[d] on the [p]olicy") (alteration in original).

Finally, with regard to the sample MPA attached to the Webb Declaration, the Amended Complaint asserts that "[a]fter August 2014, Defendants' form [MPA] continued to list TransArmor as an 'Optional Service,' which merchants could decline."  Am. Compl. ¶ 77.  Notwithstanding this oblique reference, it does not appear that this *particular document* was relied upon by Plaintiff in drafting the Amended Complaint since the pleading was filed on January 30, 2017, *see generally* Electronic Docket, while Plaintiff sourced this particular sample MPA in April 2017.  *See* Webb Decl. ¶ 6.  Therefore, the Court does not find that the attachment

of this sample MPA, supported only by a singular generalized reference in the Amended

Complaint to post-August 2014 MPAs, to be "integral" to the pleading.  *See McLennon v. City of*

*New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) ("A document is not 'integral' simply

because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that

the plaintiff *relied* on the document in preparing his complaint.") (quoting *Williams v. City of*

*New York*, No. 14–CV–5123, 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015)) (emphasis in

original).  Nor is document incorporated by reference.  *See McLennon*, 171 F. Supp. 3d at 88

("To be incorporated by reference, the complaint must make a clear, definite and substantial

reference to the documents.") (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,

265 F.R.D. 106, 123 (S.D.N.Y. 2010)).  As such, the Court declines to consider this document in

resolving the instant motion.

   In their reply papers, Defendants have attached the May 4, 2017 Declaration of Ralph

Shalom in Support of Defendants' Reply in Further Support of their Motion to Dismiss the

Amended Complaint [DE 49-13].  This Declaration sets forth facts regarding Defendants'

mailing of the August 25, 2014 letter and Amendment to Plaintiff's business address.  Plaintiff

has not only attached the letter and Amendment to its Amended Complaint, *see* Am. Compl., Ex.

C, but it has interposed specific allegations that it either failed to receive the letter or, in the

alternative, that the letter did not provide sufficient notice pursuant to the parties' Agreement.

*See* Am. Compl. ¶¶ 50-63.

   The Court finds that these allegations, which are based upon the August 25, 2014 letter,

are integral to the Amended Complaint.  As such, the Court may consider the Shalom

Declaration in the context of the instant motion.  *See Newman v. Holder*, 101 F. Supp. 2d 103,

106 (E.D.N.Y. 2000) ("defendants have submitted two declarations from . . . a staff attorney with

MDC–Brooklyn.  The Court properly may consider these declarations on a motion to dismiss because plaintiffs have alleged generally that they complained to MDC–Brooklyn staff, and such allegations are integral to their complaints."); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *Ford v. Fischer*, No. 9:09-CV-723, 2011 WL 856416, at *4 (N.D.N.Y. Jan. 31, 2011), *report and recommendation adopted*, No. 9:09-CV-723, 2011 WL 846860 (N.D.N.Y. Mar. 9, 2011) ("There is some authority for the proposition that, when it is clear from the record that the party responding to a motion to dismiss knew that additional factual submissions were being considered and, in fact, responded with its own evidentiary submissions, a court may consider factual allegations outside the complaint in deciding the motion.").

## C.  Application to the Facts

### 1.  *Declaratory Relief (Count I)*

Plaintiff has interposed an affirmative claim for "Declaratory Relief" on the basis that "Defendants have established a contracting system through which they obtain merchant signatures on the Merchant Agreement but never conclude such agreements by signing the contract, obtaining the member bank's signature on the contract, and returning it to the merchant."  Am. Compl. ¶ 98.  According to Plaintiff, [t]he Court should declare that Plaintiff ha[s] not waived any rights to rely on the signature requirement" while also declaring that the "Amendment is not binding on Plaintiff. . . ."  *Id.* ¶¶ 100-101.  Moreover, Plaintiff maintains that "[j]udicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to the proposed merchant contract."  *Id.* ¶ 102.

The Declaratory Judgement Act (the "DJA"), 28 U.S.C. § 2201, provides, in part, that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *see In re Metiom, Inc.*, No. 01-12840, 2002 WL 433588, at *2 (S.D.N.Y. Feb. 25, 2002). "Congress passed the [DJA] in 1934, which for the first time empowered federal courts to hear actions for declaratory judgment." *Fusco v. Rome Cable Corp.*, 859 F. Supp. 624, 629 (N.D.N.Y. 1994); (citing *Sturge v. Diversified Transport Corp.*, 772 F. Supp. 183, 185 (S.D.N.Y. 1991)).

"[T]he operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, 57 S. Ct. 461, 463, 81 L. Ed. 617 (1937); *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S. Ct. 876, 879, 94 L. Ed. 1194 (1950); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 138, 127 S. Ct. 764, 778, 166 L. Ed. 2d 604 (2007) ("[T]he [DJA] merely provides a different procedure for bringing an actual case or controversy before a federal court."). As such, the DJA does not create any new substantive rights or otherwise expand the jurisdictional sphere of the federal courts. *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 431 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ("The DJA does not create a source of substantive rights[.]"); *Skelly Oil Co.*, 339 U.S. at 671, 70 S. Ct. at 879, 94 L. Ed. 1194 (recognizing that by passing the DJA, "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.").

It follows that "[t]he DJA provides a remedy, not a cause of action," *KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098, 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013); *Clayton's Auto Glass, Inc. v. First Data Corp.*, No. 12-CV-

5018, 2013 WL 5460872, at *7 (E.D.N.Y. Sept. 30, 2013), and a court "may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *KM Enterprises, Inc.*, 2012 WL 4472010, at *19; *see In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d  726, 731 (2d Cir. 1993); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 247 F.R.D. 420, 422–23 (S.D.N.Y. 2007) (opining that "declaratory relief is not a claim but only a remedy that Congress has created. . ." and that the claim, or the legal theory under which relief is sought "must be based on other laws that the defendant allegedly violated in order to receive [declaratory] relief"); *Cangemi v. United States*, 939 F. Supp. 2d 188, 196 (E.D.N.Y. 2013) (stating that "declaratory relief [is] not a separate cause[ ] of action" and concluding that "Plaintiffs must properly plead an underlying cause of action in order to seek such relief."); *Econ. Opportunity Comm'n of Nassau Cty., Inc. v. Cty. of Nassau*, 106 F. Supp. 2d 433, 443 (E.D.N.Y. 2000) ("The Declaratory Judgment Act [ ] merely provides a remedy where none previously existed; it does not supply an independent cause of action.  In other words, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief.").

In addition, "courts have found declaratory judgment to be inappropriate where a party has already invoked its right to a coercive remedy." *Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prod., Inc.*, 958 F. Supp. 2d 488, 507 (S.D.N.Y. 2013) (quoting *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, 2010 WL 1257326, at *11 (S.D.N.Y. Mar. 12, 2010)).  Thus, courts have deemed "[a] cause of action for a declaratory judgment [a]s unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract." *J.C. Penney Corp. v. Carousel Ctr. Co., L.P.*, 635 F. Supp. 2d 126, 135 (N.D.N.Y. 2008) (concluding that "[s]ince Plaintiff's breach-of-contract

claims provide it with an adequate remedy in this case . . . [its claim based upon declaratory relief] was 'unnecessary and inappropriate'"); *Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d 204, 213 (E.D.N.Y. 2016) (same); *see also Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08 CIV. 10580, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) ("declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim") (citations omitted); *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010) (dismissing claim for declaratory relief and recognizing that there is a "better or more effective remedy than a declaratory judgment action-specifically, the underlying litigation itself.  Thus, there appears to be no purpose to the request for declaratory relief.").

 Moreover, "[D]eclaratory relief is intended to operate prospectively.  There is no basis for declaratory relief where only past acts are involved."  *Associated Elec. & Gas Ins. Servs. Ltd. v. Elec. Power Sys., Inc.*, No. 5:14-CV-68, 2014 WL 12717669, at *7 (D. Vt. Dec. 23, 2014) (quoting *Adirondack Cookie Co. Inc. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94 (N.D.N.Y. 2012) (internal quotation marks omitted)); *see KM Enterprises, Inc.*, 2012 WL 4472010, at *19 ("The main barrier  in a declaratory judgment action is that it cannot be used solely to adjudicate [a defendant's] past conduct.") (alteration in original); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Int'l Wire Grp., Inc.*, No. 02 CIV. 10338, 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003) (same).

 Here, Plaintiff's affirmative claim of "Declaratory Relief" is improperly pleaded inasmuch it cannot, in itself, constitute a viable cause of action since declaratory relief provides a procedural remedy rather than a substantive claim of right.  *See KM Enterprises, Inc.*, 2012 WL 4472010, at *19; *Cangemi*, 939 F. Supp. 2d at 196.  However, even assuming Plaintiff

has pleaded a separate underlying cause of action that could serve as the basis for an independent

claim for relief, the Amended Complaint contains an independently pleaded coercive claim

based upon breach of contract (Count II). *See* Am. Compl. ¶¶ 103-112.  As such, "[s]ince

Plaintiff's breach-of-contract claim[ ] provide[s] it with an adequate remedy in this case . . . [its

claim based upon declaratory relief] [is] 'unnecessary and inappropriate.'"  *J.C. Penney Corp.*,

635 F. Supp. 2d at 135; *see Harbor Distrib. Corp.*, 176 F. Supp. 3d at 213; *see also Intellectual

Capital Partner*, 2009 WL 1974392, at *6 (finding that "declaratory relief would serve no useful

purpose as the legal issues will be resolved by litigation of the breach of contract claim."); *Sofi

Classic S.A. de C.V. v. Hurowitz,* 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs'

declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in

the course of the litigation of the other causes of action.").

Indeed, the legal issues upon which Plaintiff is seeking declaratory relief, namely its

"rights, duties and obligations with respect to the proposed merchant contract," Am. Compl.

¶ 102, can properly be resolved through the adjudication of its coercive claim sounding in breach

of contract.  *See Camofi Master LDC v. College Partnership, Inc.*, 452 F. Supp. 2d 462, 480

(S.D.N.Y. 2006) (dismissing claims for declaratory relief as duplicative of breach of contract

claim).  Thus, "[a]ny 'cloud of uncertainty' regarding the scope and enforceability of the [MPA]

will be dispelled in litigation of the breach of contract claim, which also provides for damages."

*Intellectual Capital Partner*, 2009 WL 1974392, at *6.

Moreover, Plaintiff has asserted that it no longer utilizes Defendants' card processing

services.  *See* Am. Compl. ¶ 11 (stating that Plaintiff is a "former customer of Defendants"), ¶ 40

(stating that after being alerted to certain charges being imposed by Defendants, "Plaintiff

promptly terminated its relationship with Defendants").  As such, since Plaintiff is no longer a

customer of Defendants, it appears that Plaintiff seeks declaratory relief concerning Defendants'

past conduct (logically, any future conduct would not negatively impact Plaintiff since it is a

former customer no longer subject to the terms and conditions of the MPA or Processing

Agreement).  However, as stated above, "[t]here is no basis for declaratory relief where only past

acts are involved."  *Associated Elec. & Gas Ins. Servs. Ltd.*, 2014 WL 12717669, at *7;

*see KM Enterprises, Inc.*, 2012 WL 4472010, at *19;   *U.S. Bank Nat. Ass'n ex rel. Lima*

*Acquisition LP v. PHL Variable Ins. Co.*, No. 12 CIV. 6811, 2014 WL 998358, at *9 (S.D.N.Y.

Mar. 14, 2014).  As such, the Court finds that this constitutes an independent basis for dismissing

this claim.

Under the DJA, the Court has discretion whether to entertain a request for declaratory

relief.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S. Ct. 2137, 2142, 132 L. Ed. 2d

214 (1995) ("[T]he Declaratory Judgment Act . . . confer[s] on federal courts a unique and

substantial discretion in deciding whether to declare the rights of litigants."); *U.S. Bank Nat.*

*Ass'n ex rel. Lima Acquisition LP*, 2014 WL 998358, at *8.  In light of the foregoing analysis,

the Court declines to exercise such discretion here.  As such, Count I of the Amended Complaint

is dismissed.[13]

---

[13]     To the extent Plaintiff cites *Mercer Capital, Ltd. v. U.S. Dry Cleaning Corp.*, No. 08
CIV. 05763, 2009 WL 2163598, at *4 (S.D.N.Y. July 21, 2009) in support of the position that its
declaratory relief claim should not be dismissed, *see* Pl.'s Opp'n at 11, the Court finds the
decision in *Mercer Capital* unpersuasive.  Although the *Mercer Capital* court permitted
counterclaims for declaratory judgment to proceed beyond the motion to dismiss stage of the
litigation, *Mercer Capital, Ltd.*, 2009 WL 2163598, at *4, the court did not provide any
reasoning for its decision other than to state that "[h]aving considered carefully the allegations in
support of the counterclaim and the parties' arguments, the Court finds that the declaratory
judgment counterclaim is plead [*sic*] sufficiently to state a claim. . . ."  *Id.*  In light of the
discretionary nature of declaratory relief and because each case turns on the basis of its own
independent facts, the Court finds *Mercer Capital* unpersuasive and declines to apply it here.

### 2.  *Breach of Contract (Count II)*

In order to state a viable claim sounding in breach of contract pursuant to New York law,[14] a complaint must set forth the following elements:  "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *DeFlora Lake Dev. Assocs., Inc. v. Park*, 654 F. App'x 9, 10 (2d Cir. 2016) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 263 (E.D.N.Y. 2016).

"Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'" *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)) (additional citations omitted).  This "interpretation" includes "whether or not the terms of the contract are ambiguous."  *Symquest Grp., Inc.*, 186 F. Supp. 3d at 263; *see JA Apparel Corp. v. Abboud*, 586 F.3d 390, 396 (2d Cir. 2009) (recognizing that "the question of whether a written contract is ambiguous is a question of law for the court."); *Maniolos*, 74 F. Supp. 2d at 566; *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts.").

---

[14]     The parties' contract contains a choice of law provision which provides that "[o]ur Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law provisions)."  Am. Compl., Ex. B (Program Guide) § 37.1.  Neither party disputes the effectiveness of this provision nor otherwise argues that the law of another jurisdiction should apply here.  *See id.* ¶ 107 n. 6 (conceding that New York law applies to the parties' dispute); Def.'s Opp'n at 5 (applying New York law and citing to choice of law provision in Program Guide); *see also Benex LC v. First Data Merchant Servs. Corp.*, 14-CV-6393, 2016 WL 6683475, at *3 n. 7 (finding similar choice of law provision to be controlling and applying New York law).

"Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Symquest Grp., Inc.*, 186 F. Supp. 3d at 263 (quoting *Maniolos*, 741 F. Supp. 2d at 567 (collecting cases)); *see In re Residential Capital, LLC*, 531 B.R. 25, 42 (S.D.N.Y. 2015) ("If the terms of the contract are complete, clear and unambiguous on [their] face, [they] must be enforced according to the plain meaning of [their] terms, and a breach of contract claim may be dismissed on a [FRCP] 12(b)(6) motion.") (quoting *Wurtsbaugh v. Banc of Am. Secs. LLC*, No. 05 CIV. 6220, 2006 WL 1683416, at *5 (S.D.N.Y. 2006)) (internal quotations omitted) (alterations in original); *see also Rounds v. Beacon Assoc. Mgmt. Corp.*, 09 Civ. 6910, 2009 WL 4857622 at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss."). In contrast, where the language of a contract is ambiguous, "its construction presents a question of fact, which of course precludes summary dismissal." *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007); *see Symquest Grp., Inc.*, 186 F. Supp. 3d at 263; *In re Residential Capital, LLC*, 531 B.R. at 42 ("By contrast, when a provision of a contract is 'material to the breach of contract claim and is ambiguous, a FRCP 12(b)(6) motion will fail.'") (quoting *Wurtsbaugh*, 2006 WL 1683416, at *5).

In determining whether a contractual ambiguity exists in the first instance, a court's analysis is necessarily limited to the "four corners of the document" and references to outside sources in answering this question is not permitted. *JA Apparel Corp.*, 586 F.3d at 396 ("Ambiguity is determined by looking within the four corners of the document, not to outside sources...."). No ambiguity will be found to exist where the language at issue "has 'a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of

opinion.'" *Id.* (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)); *see Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Symquest Grp., Inc.*, 186 F. Supp. 3d at 264; *Maniolos*, 741 F. Supp. 2d at 567. Significantly, "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *JA Apparel Corp.*, 586 F.3d at 396; *Maniolos*, 741 F. Supp. 2d at 569 (same); *see also Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 460, 141 N.E.2d 590 (1957) ("Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact."). It follows that "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *JA Apparel Corp.*, 586 F.3d at 396-97 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)).

Moreover, where the "the terms of the contract are brought into question, the court is "'not constrained to accept the allegations of the complaint in respect of the construction of the [a]greement[.]'" *In re Residential Capital, LLC*, 531 B.R. at 42 (second alteration added); *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 195 (E.D.N.Y. 2007) ("If the interpretation of a contract is at issue, a court is 'not constrained to accept the allegations of the complaint in respect of the construction of the Agreement,' although all contractual ambiguities must be resolved in the plaintiff's favor.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); *Serdarevic*, 760 F. Supp. 2d at 329 (same).

With these principles in mind, the Court turns its attention to whether Plaintiff has alleged a viable claim of breach of contract.

### i. Whether the TA Solution Fee was Authorized by the Agreement

Plaintiff asserts that although it declined the optional TransArmor Service as set forth in the MPA, it later discovered that as of October 31, 2014 it was being charged a fee of $19.95 per month for the TransArmor service.  *See* Am. Compl. ¶¶ 37-40.  Based upon the imposition of this fee, Plaintiff claims that "Defendants have breached [the] plain terms of the [Merchant Agreement by] [ ] imposing charges that were unauthorized, including but not limited to the TransArmor fees . . . that Plaintiff . . . declined."  *Id*. ¶ 105; *see* Pl.'s Opp'n at 11-12.  At first blush, it appears that Plaintiff has pleaded the requisite elements in order to state a viable claim for breach of contract.  However, if the governing contract authorized the imposition of the TransArmor Fee for which Plaintiff takes issue, there can be no breach and hence Plaintiff's claim will fail as a matter of law.  *See Giugliano v. FS2 Capital Partners, LLC*, No. 14-CV-7240, 2015 WL 5124796, at *13 (E.D.N.Y. Sept. 1, 2015) (dismissing breach of contract claim where "the contract unambiguously provides for [Plaintiff's] unilateral right to modify the scope of the Territory"); *Symquest Grp., Inc.*, 186 F. Supp. 3d at 265-66 (finding that the "plain language of the [contract] grant[ed] [Defendant] the sole discretion to terminate [Plaintiff's] authorization to continue servicing [Defendant's] products" and concluding that the "Amended Complaint fails to state a claim for breach of contract."); *King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, No. 09 CIV. 3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009), *aff'd sub nom. Kings Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, 396 F. App'x 736 (2d Cir. 2010) (dismissing breach of contract claim since "Pitney Bowes had a contractual right to charge Kings Choice an equipment return fee.").

28

Effective October 1, 2014, Defendants instituted a service called TransArmor Solution and began imposing a $19.95 monthly fee upon its clients unless a merchant chose to opt-out. *See* Am. Compl., Ex. C (Amendment) (Preamble and § 1); *see also supra* at § II. F (describing scope of TransArmor Solution). Whether the imposition of this $19.95 fee violated the Agreement turns upon whether this fee was authorized in the first instance. To answer this question, the Court looks to the underlying terms as set forth in the Agreement.

The Program Guide contains a section entitled "Fees; Adjustments; Collection of Amounts Due." *Id*., Ex. B (Program Guide) § 19. Section 19.1 states, in part, that "[i]n consideration of the Services provided . . . [merchant] shall be charged, and hereby agree to pay us any and all fees set forth in this Agreement . . . all of which shall be calculated and payable pursuant to the terms of this Agreement and any additional pricing supplements or subsequent communications." *Id*., Ex. B § 19.1. Likewise, section 19.5 states that "[s]ubject to Section 24.3,[15] we may also *increase our fees or add new fees for Services for any reason at any time*, by notifying you thirty (30) days' prior to the effective date of any such change or addition." *Id*., Ex. B § 19.5 (emphasis added).[16] Thus, according to the Agreement's plain terms, as set forth in

---

[15]     Section 24.3 states, in relevant part, that "[i]n the event we provide notice to you of any new fees or increases in existing fees for Services, pursuant to Section 19.5, you may terminate this Agreement without further cause or penalty by notifying us that you are terminating this Agreement prior to the effective date of such new fees or increases. However, maintaining your merchant account, or your continued use of the Services after the effective date of any such fee changes shall be deemed your acceptance of such fee changes for the Services, throughout the term of this Agreement." Am. Compl., Ex. B (Program Guide) § 24.3.

[16]     To the extent Plaintiff asserts that Part IV of the Program Guide somehow circumscribed Defendants' unilateral authority to increase fees or add new fees, *see* Am. Compl. ¶ 27, the Court respectfully disagrees. Part IV of the Program Guide includes a section entitled "Additional Fees and Early Termination." *Id*., Ex. B (Part IV Additional Important Information for Cards). This section states that it pertains to merchant's "initial MasterCard, Visa and Discovery Network rates" which are "stated on your Application and may be adjusted from time to time." *Id*. There is no explicit reference that this section limits § 19.5 nor is their a reference in § 19.5 that it is limited in some way by this section. *But see* § 19.5 (explicitly stating that it is "[s]ubject to

§ 19.5, Defendants maintained the unilateral right to either increase existing fees or add new fees.  *See id*.  In this regard, whether the $19.95 fee for the TransArmor Solution constituted an increase to an existing fee or, in the alternative, embodied a new fee is inapposite since the express contractual language imbued Defendants with the right to impose the former as well as the latter.

Plaintiff does not appear to take issue with the plain language of this provision. *See* Pl.'s Opp'n at 12.  Instead, the gravamen of Plaintiff's argument is that "Defendants were imposing existing fees that had long been charged; only now, Defendants did so to a class of merchants whose MPAs Defendants knew provided that such services were not to be billed."  *Id*. As such, Plaintiff concludes that "Section 19.5 does not state that Defendants can undo a merchant's specific rejection of offered 'optional services.'"  *Id*.  While Plaintiff is correct in its interpretation that nowhere does § 19.5 authorize Defendants to disavow a merchant's previous rejection of an optional service, the balance of Plaintiff's argument, which is premised upon the notion that Defendants were charging Plaintiff a $19.95 monthly fee for a service that it previously rejected, *see id*., is without merit since this assertion is belied by the Agreement itself.

When Plaintiff contracted with Defendants for card processing services in August 2013, it declined the optional service entitled "TransArmor."  Am. Compl., Ex. A (MPA).  At that time, the service was explicitly termed "TransArmor Service" and encompassed only "a dual-

---

Section 24.3").  Thus, if Defendants sought to in some way limit their ability to increase fees or add new fees based upon certain language included in Part IV of the Program Guide, they could have set forth such a limitation explicitly.  In the absence of such limiting language, the Court does not find that Part IV otherwise circumscribes the reach or scope of § 19.5.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)) (internal quotation marks omitted) ("[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.").

layered payment card security solution that combines software or hardware-based encryption with tokenization technology." *Id.* ¶ 22, Ex. B (Program Guide) § 32 ("Special Provisions Regarding TransArmor Services"); *see supra* § II. D. (describing TransArmor Service).  In Contrast to the TransArmor Service available in August 2013, Defendants in August 2014 announced an entirely new service termed "TransArmor Solution." *Id.*, Ex. C (August 25, 2014 Letter), (TransArmor Solution Amendment).  TransArmor Solution was made available as of October 1, 2014 and "served as an amendment to the Merchant Processing Application and Agreement" as of that date.  *Id.*, Ex. C (Preamble).  The scope of services encompassed in the TransArmor Solution differed markedly from the limited encryption / tokenization services available as part of the former TransArmor Services.  *Compare id.* Ex. B (Program Guide) § 32 ("Special Provisions Regarding TransArmor Services") *with* Ex. C (TransArmor Solution Amendment) § 1 (Services); *see also supra* at § II. F.

Moreover, § 32 of the Program Guide specifically states that "[i]f [merchant] elect[s] to utilize TransArmor Service, the following additional terms and conditions apply. . . ." *Id.*, Ex. B § 32.  However, the TransArmor Solution Amendment encompasses an entirely different set of terms and conditions associated with the new service which superseded those set forth in the Program Guide itself.  *See generally id.*, Ex. C (TransArmor Solution Amendment).  Therefore, it would strain logic to assert that a merchant could decline a service whose terms and conditions were neither introduced nor in existence when the initial declination election decision was made concerning an entirely different iteration of a service.  In any event, in order to ensure that all customers had the opportunity to consider the new terms and conditions applicable to the TransArmor Solution, Defendants provided Plaintiff with a notification letter and copy of the

amended terms in August 2014.  *Id.*, Ex. C.  Likewise, Plaintiff had until October 1, 2014 to opt-out of the TransArmor Solution.  *Id.*

  In light of the date of inception of the TransArmor Solution (rolled out over a year after Plaintiff declined TransArmor Service in August 2013) coupled with an entirely different range of services being offered and the fact that the terms and conditions applicable to TransArmor Solution were not in existence at the time Plaintiff declined the TransArmor Service in August 2013, Plaintiff's argument that the imposition of this $19.95 monthly fee was improper because it had specifically rejected the service has no merit.

### ii.   Whether Sufficient Notice of the TA Solution Fee was Provided

  In the alternative, Plaintiff claims that § 19.5 required that Defendants provide a party with notice "and Plaintiff alleges that it received no notice or alternatively, inadequate notice." Pl.'s Opp'n at 13; *see* Am. Compl. ¶¶ 50-63; *supra* § II. F. 4.

  Section 19.5 states, in relevant part, that "we may also increase our fees or add new fees for Services for any reason at any time, by *notifying you thirty (30) days' prior to the effective date of any such change or addition*."  *Id.*, Ex. B § 19.5 (emphasis added).  In addition, Section 24.3, which applies to § 19.5, states, in part, that "[i]n the event we provide notice to you of any new fees or increases in existing fees for Services, pursuant to Section 19.5, you may terminate this Agreement without further cause or penalty by notifying us that your are terminating this Agreement prior to the effective date of such new fees or increases.  However, maintaining your merchant account, or your continued use of the Services after the effective date of any such fee changes shall be deemed your acceptance of such fee changes for the Services, throughout the term of this Agreement."  *Id.*, Ex. B (Program Guide) § 24.3.

Further, although not cited by either party, § 38.3 contains an explicit provision entitled

"Notices."  *Id*., Ex. B (Program Guide) § 38.3.  This provision states, in relevant part, as follows:

> All notices and other communications required or permitted
> hereunder (other than those involving normal operational matters
> relating to the processing of Card transactions) shall be in writing,
> if to you at your address appearing in the Application or by an
> electronic means, including but not limited to the e-mail address
> your have provided on the Application . . . *Notice shall be deemed
> to have been given (i) if sent by mail or courier, upon the earlier of
> five (5) days after mailing or when actually received* or, in the case
> of courier, when delivered, and (ii) if sent by facsimile machine,
> when the courier confirmation copy is actually received.  Notice
> given in any other manner shall be effective when actually received.
> Notices sent to your last known address (including e-mail address),
> as indicated in our records, shall constitute effective notice to the
> Merchant under this Agreement.

*Id*.  Defendants provided notice of the imposition of the $19.95 TransArmor Solution fee, as

required under §§ 19.5 and 38.3 by engaging Corporate Direct, Inc., a third-party service, which

printed and mailed the August 25, 2014 letter and accompanying Amendment to the Plaintiff's

business address as set forth on the MPA.  *See* May 4, 2017 Declaration of Ralph Shalom in

Support of Defendants' Reply in Further Support of their Motion to Dismiss the Amended

Complaint ("Shalom Decl.") [DE 49-13] ¶ 2-3.  In addition, Defendants "required that Corporate

Direct, Inc. prepare a digital copy of all of the letters that it mailed and to provide those copies as

a record of the printing and mailing it performed."  *Id*. ¶ 4.  According to the Shalom

Declaration, it was this archived digital copy that Defendants provided to Plaintiff on

January 6, 2017, during "informal discovery."  *Id*. ¶ 5; *see also* Am. Compl., ¶¶ 50-63 (relying

on letter and Amendment for certain claims), Ex. C.

In light of the fact that the letter was dated August 25, 2014 and the TransArmor Solution

fee did not take effect until October 1, 2017, the letter complies with the plain language of

§ 19.5, which requires that Defendants provide Plaintiff with 30 days' notice of a change to an

existing fee or imposition of a new fee.  Am. Compl., Ex. B (Program Guide) § 38.3.  In

addition, although Plaintiff asserts that it "did not receive the letter or Amendment," *id*. ¶ 50,

§ 38.3 of the Program Guide specifically provides that "Notice shall be deemed to have been

given (i) if sent by mail . . . upon the earlier of five (5) days after mailing or when actually

received."  *Id*., Ex. B (Program Guide) § 38.3.  Thus, by the Agreement's plain terms, notice is

presumed to have been given upon five (5) days following a mailing unless such notice is

actually received prior to such a date.  *See id*.  As such, the mere fact that Plaintiff alleges it did

not receive the Notice is inapposite, where, as here, the Agreement does not require actual

receipt for proper notice to have been effected.  *Id*.; *see Banks*, 475 F. Supp. 2d 189 at 195("If

the interpretation of a contract is at issue, a court is 'not constrained to accept the allegations of

the complaint in respect of the construction of the Agreement,' although all contractual

ambiguities must be resolved in the plaintiff's favor.") (quoting *Int'l Audiotext Network, Inc.*,

62 F.3d at 72); *Serdarevic*, 760 F. Supp. 2d at 329.

Moreover, Plaintiff's allegations and argument that the letter and Amendment provided

inadequate notice, *see* Am. Compl. ¶¶ 50-63; Pl.'s Opp'n at 13, is similarly without merit since

the Agreement sets forth only that all notices "shall be in writing."  Am. Compl., Ex. B (Program

Guide) § 38.3 ("All notices and other communications required or permitted hereunder (other

than those involving normal operational matters relating to the processing of Card transactions)

shall be in writing.").  Thus, Plaintiff's attempt to graft on an "adequacy" requirement to the

contract's plain terms in unavailing.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr.*

*Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) ("[I]f an agreement is complete, clear and

unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.").

Here, the plain terms of the Agreement state that in order to comply with the contractual notice terms, Defendants were required only to provide *written* notice at least 30 days' prior to a fee change or new fee being imposed.  *See id*. Ex. C (Program Guide) §§ 19.5, 38.3.  Where such written notice has been provided in the required timeframe, the contract's notice provisions have been satisfied.  To the extent Plaintiff tacitly urges the Court to find an ambiguity in § 38.3 by reading an "adequacy" requirement into the Agreement, *id*. ¶¶ 50-63; Pl.'s Opp'n at 13, the Court declines to do so as such an interpretation would contravene the plain language in the Agreement itself.   *See Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 763 F. Supp. 36, 45 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992) ("courts must enforce the legal relations in accordance with the meaning ascribed by the contract"); *Hartol Prod. Corp. v. Prudential Ins. Co. of Am.*, 290 N.Y. 44, 47, 47 N.E.2d 687, 689 (1943) ("It is unquestionably the rule that . . . contracts[ ] are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, the terms are to be taken and understood in their plain, ordinary, and proper sense.") (internal citation omitted); *Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, LP*, 31 Misc. 3d 1225(A), 929 N.Y.S.2d 199 (Sup. Ct. 2011) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").  Thus, this argument fails.

### iii.   Whether Plaintiff's Failure to Comply with the Notice of Claim Provision Bars Any Remaining Claims

Defendants assert that all of Plaintiff's claims premised upon a breach of contract theory would nevertheless be barred based upon "Plaintiff's failure to plead compliance with the contract's notice-of-claim provision [which] bars any claim."  Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("Def.'s Mem.") [DE 49-1] at 10

(emphasis omitted).  Although conceding that it has failed to plead such compliance, *see* Pl.'s

Opp'n at 23 (stating that the notice-of-claim provision "could not bar Plaintiff's claims . . .

because Plaintiff did raise these charges within 60 days" but conceding that "these facts were not

included in the Amended Complaint" and that such statements were only raised in its opposition

in order to "respond to Defendant's [ ] argument"), Plaintiff nevertheless argues multiple bases

as to why the notice-of-claim provision does not foreclose recovery.  Essentially, Plaintiff asserts

that the notice-of-claim provision:  (1) "does not apply to the charges at issue in this case" or is

"ambiguous;" (2) was satisfied in that Plaintiff "preemptively disputed the[ ] charges by rejecting

them in [its] MPA;" (3) cannot be invoked here "as a matter of equity" based upon the

"deceptive manner in which Defendants [levied] the[ ] charges."  Pl.'s Opp'n 18-24.  The Court

finds that each of these arguments lacks merit.

      Section 19.11 (the notice-of-claim provision) provides that the merchant

> "agrees to promptly and carefully review your merchant statements
> or other documents provided or made available to you (physically,
> electronically or otherwise provided by Us or others) reflecting Card
> transaction activity, including activity in your Settlement Account,
> If you believe any adjustments should be made with respect to your
> Settlement Account, you must notify us in writing within sixty (60)
> days after any debit or credit is or should have been effected or such
> shorter period as provided in the terms and conditions that govern
> such account.  If you notify us after sixty (60) days, we shall have
> no obligation to investigate or effect any adjustments."

Am. Compl., Ex. B (Program Guide) § 19.11.  In addition

> "Settlement Account," in turn, is defined as "[a]n account or
> account(s) at a financial institution designated by Client as the
> account to be debited and credited by Processor or Bank for Card
> transactions, fees, Chargebacks and other amounts due under the
> Agreement or in connection with the Agreement."

*Id.*., Ex. B § 39 (Glossary).

Having conceded that it failed to plead compliance with § 19.11, Plaintiff's claims are barred since its "failure to comply with the Contact's notice provision [ ] bars recovery." *Benex LC v. First Data Merch. Servs. Corp.*, No. 14-CV-6393, 2016 WL 1069657, at \*4 (E.D.N.Y. Mar. 16, 2016) (containing a similar notice of claim provision).  Indeed, "[f]ailure to strictly comply with contractual notice and documentation provisions has been held to constitute a waiver of any claim for damages."  *D.C.R. Trucking & Excavation, Inc. v. Aetna Cas. and Sur. Co.*, No. 96-CV-3995, 2002 WL 32096594, at \*6 (E.D.N.Y. Oct. 31, 2002); *see also Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) ("[e]xpress conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed.") (quoting *Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.*, 42 A.D.3d 559, 840 N.Y.S.2d 144, 145 (App. Div. 2007) (citation omitted)); *Schindler Elevator Corp. v. Tully Const. Co.*, 139 A.D.3d 930, 931, 30 N.Y.S.3d 707, 709 (App. Div. 2016) (same).  Moreover, Plaintiff's attempt to plead facts in its opposition memorandum alleging its compliance with § 19.11 is unavailing since "parties cannot amend their pleadings through issues raised solely in their briefs, and such facts are thus irrelevant for purposes of determining whether plaintiff's Complaint should be dismissed for failure to state a claim. . . ." *Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 568 (S.D.N.Y. 2009) (internal citation omitted) (alteration omitted); *see Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 469 (S.D.N.Y. 2014) ("[I]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."  Accordingly, Plaintiffs have failed to plead that they are third-party beneficiaries sufficiently to survive Defendant's Motion.") (internal citation omitted); *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526 (S.D.N.Y. 2015) ("[a]

complaint cannot be amended merely by raising new facts and theories in [a plaintiff's] opposition papers") (alteration in original).

In any event, Plaintiff's initial argument, that the provision does not encompass the "flat monthly service fees levied directly by Defendants and not tied to any transaction activity," Pl.'s Opp'n at 19, is undermined by the provision itself.  Specifically, § 19.11 provides that in the event a merchant finds, after reviewing its merchant statements, that "any adjustments should be made with respect to your Settlement Account" the merchant must "notify [Defendants] in writing within sixty (60) days. . . ."  *Id*.., Ex. B § 19.11.  Likewise, the definition of a merchant's "Settlement Account" includes "Card transactions, *fees*, Chargebacks *and other amounts under the Agreement or in connection with the Agreement*."  *Id*.., Ex. B § 39 (emphasis added).  Thus, by its plain terms this provision in conjunction with the definition of "Settlement Account" provides a clear indication that § 19.11 applied not only to card transactions but to "fees" and "other amounts" as well.  To the extent Plaintiff urges the Court to accept this altogether contrived reading of this provision, the Court declines to do so.  Indeed, adopting such a reading would fail to give proper meaning and effect to the broad sweep of § 19.11's notice mandate.  *See Banco Espanol de Credito*, 763 F. Supp. at 45.

Plaintiff fairs no better in arguing that § 19.11 has been satisfied since it "preemptively disputed" the imposition of the TransArmor fees "by rejecting them in [the] MPA[ ]" Pl.'s Opp'n at 22.  As the Court has already discussed, Plaintiff could not have rejected TransArmor Solution or the associated fee since that specific iteration of the service had not even been introduced at the time Plaintiff rejected the predecessor service.  *See supra* § III. C. 2. i. (discussing at length why Plaintiff could not have rejected TransArmor Solution).  As such, the Court will not spill any further ink on this argument.

Finally, although Plaintiff, in an altogether perfunctory fashion, asserts that § 19.11 should not be given effect "as a matter of equity" based upon the allegedly "deceptive manner in which Defendant's [levied] these charges," Pl.'s Opp'n at 23, this argument fails since Plaintiff cannot invoke the court's equitable powers when an adequate remedy at law exists." *See Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 65 (S.D.N.Y. 1978) ("[T]he right to maintain a suit for an equitable accounting, like all other equitable remedies [depends upon] the absence of an adequate remedy at law."); *Speedfit LLC v. Chapco Inc.*, No. 15CV1323JMASIL, 2016 WL 5793738, at *10 (E.D.N.Y. June 29, 2016), *report and recommendation adopted*, No. 15 CV 1323, 2016 WL 5678812 (E.D.N.Y. Sept. 30, 2016) ("claims [that are] equitable in nature [ ] generally are not permitted if a legal remedy is available.").  Here, Plaintiff's attempt to invoke the Court's equity powers in adjudicating certain aspects of the underlying breach of contract claim, which itself provides for an adequate remedy at law (*i.e.*, damages), are unpersuasive and the Court declines the invitation to grant such relief.

To the extent Plaintiff argues that there was "deception" on the part of Defendants in charging the TransArmor fee which could serve as an independent basis for waiving the notice requirement, no fraud claim has been asserted in the Amended Complaint.  The purported "deceptive" conduct underlying Plaintiff's rationale for the Court to exercise its powers in equity is not actionable in the present context which alleges only breach of contract claims.

In light of the foregoing analysis, Plaintiff's claims sounding in breach of contract are dismissed.

### 3.  Breach of the Implied Covenant of Good Faith & Fair Dealing (Count II)

Although Plaintiff attempts to plead a claim based upon the implied covenant of good faith and fair dealing in conjunction with its breach of contract cause of action, *see* Am. Compl.

(Count II) (alleging "Breach of Contract *and* Breach of the Covenant of Good Faith and Fair Dealing") (emphasis added), this claim fails since "[u]nder New York law, a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim." *Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743, 2012 WL 3679319, at *3 (E.D.N.Y. Aug. 22, 2012); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) (same); *see also L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 433 n. 17 (2d Cir. 2011) ("[B]reach of [the duty of good faith and fair dealing] is merely a breach of the underlying contract.") (internal citations and quotations omitted)).

Indeed, "a claim for breach of the covenant of good faith and fair dealing will be duplicative of a breach of contract claim where the claims are based on the same allegations or where the same conduct is the predicate for both claims." *Dorset Indus., Inc.*, 893 F. Supp. 2d at 405 (quoting *McGee v. State Farm Mut. Auto. Ins. Co.,* No. 09–CV–3579, 2011 WL 5409393, at *8 (E.D.N.Y. Nov. 8, 2011)). Here, Plaintiff relies upon the same predicate facts for both its breach of contract and its breach of the covenant of good faith and fair dealing. *See* Am. Compl. ¶¶ 103-112. These claims are therefore duplicative and Plaintiff's claim based upon the implied covenant of good faith and fair dealing is dismissed. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant"); *Hall v. Earthlink Network. Inc.*, 396 F.3d 500, 508 (2d Cir. 2005) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional

claim is actually stated."); *Serdarevic,* 760 F. Supp. 2d at 334 ("A claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of a covenant of an express provision of the underlying contract.").

### 4. *Unconscionability (Count III)*

The Third Count of the Amended Complaint attempts to assert an affirmative claim of unconscionability. *See* Am. Compl. ¶¶ 113-123. This claim seeks "monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit." *Id*. ¶ 123. However, this claim fails as a matter of law since "[u]nder New York law, unconscionability is an affirmative defense to the enforcement of a contract. . . . A cause of action for unconscionability may not be used to seek affirmative relief." *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 573 (E.D.N.Y. 2015) (quoting *Ng v. HSBC Mortgage Corp.,* No. 07–CV5434, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011)); *see Knox v. Countrywide Bank,* 4 F.Supp.3d 499, 513 (E.D.N.Y. 2014) ("to the extent that the complaint alleges causes of action based on . . . unconscionability, those claims are dismissed"); *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274 (S.D.N.Y. 2017) (same); *see also Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 35 A.D.3d 350, 354, 826 N.Y.S.2d 392, 396 (App. Div. 2006) ("The third cause of action seeking affirmative relief on the ground of unconscionable contract terms must also be dismissed as [t]he doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery.") (internal quotations and citation omitted).

The two cases cited by Plaintiff in support of the proposition that "[c]ourts regularly entertain claims where plaintiffs seek affirmative declaratory relief that contract terms are unconscionable are unpersuasive. Pl.'s Opp'n at 24. With respect to *305 E. 24th Owners Corp.*

*v. Parman Co.*, 994 F.2d 94, 95 (2d Cir. 1993), the Second Circuit's opinion was limited solely to the "clarif[ication] [of] the issue of attorney's fees pursuant to the Abuse Relief Act." *Id.* Therefore, to the extent the court mentioned, in passing, that "under common law principles of unconscionability [plaintiff] moved to dismiss these claims," this statement was only of an expository nature and therefore did not state or affirm a principle of law.  Likewise, in *Lonner v. Simon Prop. Grp., Inc.*, 57 A.D.3d 100, 108, 866 N.Y.S.2d 239 (2008), the court characterized the plaintiff's claim of unconscionability as "not seeking affirmative recovery under the doctrine of unconscionability, but instead seeks a declaration that the dormancy fee clause is unenforceable." *Id.*  In contrast, in the instant case, Plaintiff explicitly pleads an affirmative claim of unconscionability and seeks a full range of relief including damages.  *See* Am. Compl. ¶¶ 113-123.

Based upon the foregoing analysis, Plaintiff's affirmative claim of unconscionability is dismissed.

### 5.  *Unjust Enrichment (Count IV)*

Plaintiff has also asserted a quasi-contract claim for unjust enrichment.[17]  *See* Am. Compl. ¶¶ 124-132.  This claim, according to Plaintiff, is being brought only "in the alternative and is contingent on Defendants' contracts with Plaintiff . . . being deemed ineffective, inapplicable, or enforceable in whole or in part." *Id.* ¶ 125.  Essentially, the *gravamen* of Plaintiff's argument in this regard is that "the MPA and Amendment are ineffective because, as alleged, neither Defendants nor the Bank signed the MPA . . . and the Bank did not consent in writing to any changes to the MPA, as was expressly required."  Pl.'s Opp'n at 8 (citing Am.

---

[17]     To plead a valid claim of unjust enrichment, a plaintiff  "must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

Compl. ¶¶ 29-33, 36, 62, 98-101).  In reply, Defendants assert that the contract's effectiveness

was not foreclosed by the lack of a signature since "it explicitly requires Ignite's *acceptance*

[and] [h]ere, Defendants accepted the contract by performing under it for three years."

Defendants' Reply in Further Support of Their Motion to Dismiss the Amended Complaint

("Defs.' Reply") [DE 49-12] at 4 (citing Am. Compl., Ex. A) (emphasis in original); *see also*

Am. Compl. ¶¶ 35, 38-40 (setting forth, in part, that Plaintiff engaged Defendants' card

processing services in August 2013 after "entering into the [MPA]").  Moreover, Defendants

contend that Plaintiff "ignores that the Bank is not a party to the contract for 'Non-Bank

Services.'"  Defs.' Reply at 5 (citing Am. Compl., Ex. B (Program Guide) (Preface); *see also*

*supra* at § II. C. (setting forth applicable language, which, in part, identifies that TransArmor

constituted a "Non-Bank" service).

 "Under . . . New York law, if the validity or enforceability of a contract is in doubt or

uncertain, claims of unjust enrichment may survive a motion to dismiss."  *Gao v. JPMorgan

Chase & Co.*, No. 14 CIV. 4281, 2015 WL 3606308, at *5 (S.D.N.Y. June 9, 2015) (internal

quotation and citation omitted) (permitting claim of unjust enrichment to be pleaded in the

alternative where plaintiff asserted the contract was unenforceable); *see Agerbrink v. Model Serv.

LLC*, 155 F. Supp. 3d 448, 459 (S.D.N.Y. 2016); *DeWitt Stern Grp., Inc. v. Eisenberg*,

14 F. Supp. 3d 480, 485 (S.D.N.Y. 2014) (finding claim of unjust enrichment could proceed

where Plaintiff pleaded unenforceability of underlying contract); *see also Downey v. Adloox Inc.*,

238 F. Supp. 3d 514, 526 (S.D.N.Y. 2017) ("Unjust enrichment may be pleaded in the

alternative, but only where there is a bona fide dispute as to whether a relevant contract exists or

covers the disputed issue."); *Benex LC*, 2016 WL 1069657, at *6 (same).

The corollary to this proposition is that "the existence of a contract generally bars recovery based on the quasi-contract theory of unjust enrichment. *Agerbrink*, 155 F. Supp. 3d at 459 (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 361, 907 N.E.2d 268 (2009)("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.")); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543, 2017 WL 2839154, at *31 (S.D.N.Y. June 30, 2017), *modified on reconsideration,* No. 14-MC-2543, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ("It is one of the well-settled principles of New York law that the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (alteration omitted).

Although the Amended Complaint challenges the existence of the underlying contract, *see* Am. Compl. ¶¶ 28-34 (challenging effectiveness of MPA based upon lack of signatures by Ignite and Bank), these assertions do not raise a "bona fide dispute as to whether a relevant contract exists." *Downey*, 238 F. Supp. 3d at 526. Indeed, there is no dispute that Plaintiff executed the governing MPA and therefore agreed to be bound by its terms as well as those terms incorporated by the Program Guide and any Amendments. *See* Am. Compl., Ex. A (signed MPA [Plaintiff's signature is redacted]); *id.* ¶ 37 ("In the Merchant Agreement *that is signed*, Plaintiff declined the 'optional' TransArmor service . . . .) (emphasis added). In addition, although the Amended Complaint asserts that Defendants imposed an allegedly unauthorized fee for TransArmor Solution that Plaintiff had previously declined, *see, e.g.*, Am. Compl. ¶¶ 39-41, 105, it does not interpose any allegations that despite "engag[ing] Defendants' [card processing] services in August 2013," *id.* ¶ 35, Defendants nevertheless failed to provide the underlying

processing services for the duration of the parties' business relationship.  To the contrary, the gist

of the underlying claims are that Plaintiff was enrolled in and charged for a service that it alleges

was optional and that it did not desire.  *See id*. ¶ 40 ("Defendants imposed the improper and

unauthorized $19.95 monthly TransArmor charge on Plaintiff for more than 20 months . . . .").

Plaintiff accepted the terms of the MPA and all incorporated documents upon signing it.

*See* Am. Compl., Ex. A (MPA).  The Complaint does not interpose any allegations that Plaintiff

objected or otherwise failed to accept the contract's benefits (*i.e.*, credit / debit card processing

services) during the duration of the business relationship.  That being the case, Plaintiff is now

estopped from asserting that no valid contract ever existed.  *See Nirvana Int'l, Inc. v. ADT Sec.

Servs., Inc.*, 525 F. App'x 12, 13–14 (2d Cir. 2013) ("[W]hen a party receives a contract, makes

no clear objection to its terms, and then accepts the contract's benefits, the benefitting party is

estopped from avoiding the binding effect of the disavowed provision."); *LaRoss Partners, LLC

v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 155 (E.D.N.Y. 2012) ("[A] party is estopped from

denying a contract provision when it has directly benefited from the contract.").  This rule

applies with equal force even where a party failed to sign a contract but otherwise accepted its

benefits.  *See Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC*, No. 11

CIV. 6804, 2012 WL 527209, at *4 (S.D.N.Y. Feb. 17, 2012) ("Under this 'direct benefits

theory' of estoppel, a party which is a non-signatory to a contract, but which nonetheless

receives a direct benefit from that contract, is estopped from seeking exclusion from provisions

of the contract."); *In re Refco, Inc. Securities Litig.*, No. 07 Civ. 11604, 2008 WL 2185676, at *5

(S.D.N.Y. May 21, 2008) ("The lack of a signature on a contract does not affect its validity

where the non-signing party received the contract and knowingly accepted its benefits.").

As such, where, as here, Plaintiff belatedly attempts to invoke the mere lack of Defendants'

signatures as a means to attack the overall efficacy of the contract after being presented with and signing the MPA, failing to timely object to its terms and otherwise accepting the card processing services for at least 20 months, Am. Compl. ¶ 40, it is estopped from doing so.[18] *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree.").

In light of this analysis, there is no "*bona fide*" dispute as to the enforceability of the underlying contract. Therefore, the Court finds that Plaintiff's unjust enrichment claim cannot survive. *See Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011) (recognizing that "[t]he existence of a valid written contract generally precludes proceeding on grounds of unjust enrichment, unless there is a bona fide dispute over the existence of the contract," and dismissing counterclaim for unjust enrichment where "there [was] no genuine disagreement over the existence of a contract"); *Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131, 2015 WL 1014327, at *5 (E.D.N.Y. Mar. 9, 2015) (finding that "[w]hen there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim" but concluding that the contract at issue "set forth the terms of the purchase agreement and contained a signature page. Under these circumstances, dismissal of the unjust enrichment claim is warranted."); *see also Matana v. Merkin*, 957 F. Supp. 2d 473, 495 n. 10 (S.D.N.Y. 2013) (recognizing that dismissal of an unjust enrichment claim is appropriate when a valid

---

[18]     In this regard, Defendants could not disavow the effectiveness of the contract based upon the lack of its own signature either since it too had notice of all of the contract's terms, performed by providing card processing services to Plaintiff and otherwise retained a reciprocal benefit in the form of charges and fees.

contract exists and distinguishing that proposition from a case involving a "fog of multiple contracts, sub-agreements and Placement Memos" that made it impossible to determine, without discovery, whether a contract existed).

### 6. *Leave to Replead*

Plaintiff seeks leave to "amend to cure any defects the Court may identify."  Pl.'s Opp'n at 30.  "Under Rule 15(a), leave to amend shall be freely given when justice so requires." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotations and citations omitted); *see McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy*, 482 F.3d at 200.  However, "[a] plaintiff need not be given leave to amend if it fails to specify [ ] to the district court . . . how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA*, 758 F.3d at 505-06; *see, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 n. 71 (2d Cir. 2014) (denying leave to amend where "plaintiffs have identified no additional facts or legal theories—either on appeal or to the District Court—they might assert if given leave to amend"); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.").

Here, Plaintiff has failed to provide the Court with any indication as to how leave to amend would cure the deficiencies in the Amended Complaint.  *See* Pl.'s Opp'n at 30 (requesting leave to amend but failing to articulate how further amendment would cure deficiencies). Indeed, Plaintiff has already had one opportunity to amend its pleading and there is no indication that any further leave would produce a better result.  *See TechnoMarine SA*, 758 F.3d at 506

("Plaintiff already amended its complaint once . . . [and] TechnoMarine failed to resolve its

pleading deficiencies in its First Amended Complaint.  In its request to amend this complaint

below and in its brief here, moreover, TechnoMarine has entirely failed to specify how it could

cure its pleading deficiencies. We therefore affirm the district court's denial of Plaintiff's request

further to amend the complaint and its decision to grant the motion to dismiss with prejudice.");

*Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim

with prejudice in absence of any indication plaintiff could or would provide additional

allegations leading to different result); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs.,

LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where

plaintiff's "request gives no clue as to how the complaint's defects would be cured") (internal

quotation marks omitted); *see also Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir.

2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of

the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal

quotation marks omitted).

In any event, based upon the Court's analysis as set forth in this Memorandum and Order,

any further amendment of the existing claims would be futile.  *In re American Exp. Co.

Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994) ("leave to amend may be denied if the

amendment would be futile"); *Sodhi v. Mercedes Benz Fin. Servs., USA, LLC*, 957 F. Supp. 2d

252, 255 (E.D.N.Y. 2013) ("[I]t is well established that leave to amend a complaint need not be

granted when amendment would be futile."); *Donovan v. Am. Skandia Life Assur. Corp.*, 217

F.R.D. 325, 325 (S.D.N.Y. 2003), *aff'd*, 96 F. App'x 779 (2d Cir. 2004); *see also Oneida Indian

Nation of New York State v. Cty. of Oneida, N.Y.*, 199 F.R.D. 61, 94–95 (N.D.N.Y. 2000) ("[I]t

would be futile to allow plaintiffs to amend their complaints when it would be unproductive in

that under the court's rulings today plaintiffs would not be entitled to recover the very relief

which forms the basis for these motions.").  As such, Plaintiff's request for leave to replead its

claims is denied.

**IV.**   **C**ONCLUSION

Based upon the foregoing analysis, Defendants' motion to dismiss the Amended

Complaint is GRANTED in its entirety.  The Clerk of the Court is directed to close this case.


                                                         **SO ORDERED.**

Dated: Central Islip, New York
       October 31, 2017


                                                         /s/ Sandra J. Feuerstein
                                                         SANDRA J. FEUERSTEIN
                                                         U.S. District Judge